1    DAVID R. SINGH (Bar No. 300840)
2    david.singh@weil.com
     ERIC RIVAS (Bar No. 324577)
3    eric.rivas@weil.com
4    WEIL, GOTSHAL & MANGES LLP
     201 Redwood Shores Parkway
5    Redwood Shores, CA  94065
6    Telephone:  (650) 802-3000
     Facsimile:  (650) 802-3100
7
8    Attorneys for Defendant
     RENT THE RUNWAY, INC.
9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                    WESTERN DIVISION

13

14

| | |
|---|---|
| 15  FASHIONPASS, INC., | Case No. 2:19-cv-03537-GW-JC |
| 16                       Plaintiff, | **MEMORANDUM OF LAW IN** |
| 17        vs. | **SUPPORT OF DEFENDANT RENT THE RUNWAY, INC.'S MOTION TO** |
| 18  RENT THE RUNWAY, INC., | **DISMISS PLAINTIFF FASHIONPASS, INC.'S FIRST** |
| 19                       Defendant. | **AMENDED COMPLAINT FOR** |
| 20 | **FAILURE TO STATE A CLAIM** |
| 21 | Date:        October 7, 2019 |
| 22 | Time:        8:30 a.m. |
| 23 | Place:       Room 9D, 9th Floor |
| 24 | Judge:  Hon. George H. Wu |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT..................................................................... 1

FACTUAL BACKGROUND ........................................................................ 5

I.   RTR IS A PIONEER IN THE FASHION INDUSTRY AND HAS A SUPERIOR OFFERING TO CONSUMERS ................................................. 5

II.  THE "FASHION RENTAL BUSINESS" MARKET..................................... 6

III. FASHIONPASS'S ALLEGED INABILITY TO COMPETE.......................... 7

IV.  PROCEDURAL HISTORY .................................................................... 8

LEGAL STANDARD ............................................................................... 9

ARGUMENT ......................................................................................... 10

I.   FASHIONPASS'S MONOPOLIZATION, ATTEMPTED MONOPOLIZATION, UCL, AND TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE CLAIMS FAIL FOR LACK OF HARM TO COMPETITION........................................... 10

   A.   FashionPass Still Cannot Plead Harm to Competition ................ 11

   B.   FashionPass Still Cannot Plead Substantial Foreclosure ............ 13

   C.   FashionPass Cannot Plausibly Show RTR Maintained, or Has A Dangerous Probability of Acquiring, Monopoly Power ............... 16

      1.   FashionPass Does Not Plausibly Allege Direct Evidence of Monopoly Power ............................................................ 17

      2.   FashionPass Does Not Plausibly Allege Circumstantial Evidence of Monopoly Power ............................................ 18

      3.   FashionPass Cannot Plausibly Allege RTR Has A Dangerous Probability of Attaining Monopoly Power .............. 21

   D.   FashionPass's UCL and Tortious Prospective Economic Advantage Claims Fall with the Sherman Act Claims............... 22

II.  FASHIONPASS'S TORTIOUS INTERFERENCE CLAIMS ARE LEGALLY DEFICIENT ................................................................ 22

   A.   FashionPass's Intentional Interference with Contract and Prospective Economic Advantage Claims Also Fail Because It Does Not Plausibly Plead RTR Intentionally Disrupted Any Relationships ............................................................................... 23

   B.   FashionPass Fails to Allege Facts That Plausibly Demonstrate RTR Knew of Any Specific Contract Between FashionPass and the Purchase Order Manufacturers................................................. 25

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AD/SAT v. Associated Press*, 181 F.3d 216 (2d Cir. 1999) ................................... 16

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
 141 F.3d 947 (9th Cir. 1998) ................................................................. 17

*Alexander v. Metro-Goldwyn-Mayer Studios, Inc.*,
 No. 17-3123, 2017 WL 5633407
 (C.D. Cal. Aug. 14, 2017)....................................................................... 6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................. 9, 10, 12

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
 166 F. Supp. 3d 988 (N.D. Cal. 2015).................................... 13, 18, 22

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...................... 3, 10

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ................... 15, 18

*Carefusion Corp. v. Medtronic, Inc.*, No. 10-01111,
 2010 WL 4509821 (N.D. Cal. Nov. 1, 2010) ................................... 22

*Chapman v. Abbott Labs.*, 930 F. Supp. 2d
 1321 (M.D. Fla. 2013) ............................................................................ 6

*Eastman v. Quest Diagnostics Inc.*, 108 F. Supp. 3d
 827 (N.D. Cal. 2015) ..................................................................*passim*

*Elecs. For Imaging, Inc. v. Coyle*, No. 01-4853,
 2005 WL 1661958 (N.D. Cal. July 14, 2005) ................................... 20

*Extreme Reach, Inc. v. Spotgenie Partners, LLC*,
 No. 13-07563, 2014 WL 12781769
 (C.D. Cal. Apr. 14, 2014) ................................................................... 22

*Exxon Corp. v. Berwick Bay Real Estates Partners*,
 748 F.2d 937 (5th Cir. 1984) (per curiam) ....................................... 19

*F.M. Tarbell Co. v. A & L Partners, Inc.*, No. CV 10–1589,
 2011 WL 1153539 (C.D. Cal. Mar. 23, 2011) ................................... 24

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
   771 F.3d 1119 (9th Cir. 2014) .................................................. 24, 25

*Harbridge v. Schwarzenegger*, No. 07-4486,
   2011 WL 6960830  (C.D. Cal. Aug. 31, 2011) ................................ 6

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
   No. 13–00740, 2013 WL 6682981
   (E.D. Va. Dec. 18, 2013) ............................................... 18, 19

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) .................................. 6

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ...................................................... 12

*Marder v. Lopez*, 450 F.3d 445 (9th Cir. 2006) .................................... 5

*Maximum Availability Ltd. v. Vision Sols., Inc.*,
   No. 10-1488, 2010 WL 11508470
   (C.D. Cal. Dec. 16, 2010) ................................................. 12

*name.space, Inc. v. Internet Corp. for Assigned
   Names & Nos.*, No. 12–8676, 2013 WL 2151478
   (C.D. Cal. Mar. 4, 2013) .................................................. 25

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ................................. 16

*Ojmar U.S., LLC v. Sec. People, Inc.*,
   No. 16–04948, 2017 WL 3301214
   (N.D. Cal. Aug. 2, 2017) .................................................. 18

*Optronic Techs, Inc. v. Ningbo Sunny Elec. Co.*,
   No. 16–06370, 2017 WL 4310767
   (N.D. Cal. Sept. 28, 2017) ................................................ 21

*Oser Commc'ns Grp., Inc. v. Solar Energy Trade Shows*,
   No. 12-01534, 2013 WL 12128817
   (C.D. Cal. Feb. 22, 2013) ................................................. 22

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ........................................... 17, 21

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*,
   No. 12–05847, 2013 WL 3242245
   (N.D. Cal. June 25, 2013) ................................................. 16

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*,
  No. 12–05847, 2013 WL 5694452
  (N.D. Cal. Oct. 18, 2013) ............................................................. 14, 15, 16

*Sidibe v. Sutter Health*, 4 F. Supp. 3d
  1160 (N.D. Cal. 2013) ................................................................. 17, 18

*SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*,
  88 F.3d 780 (9th Cir. 1996) ................................................................ 11

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) .......................................................................... 14

*United States v. Aluminum Co. of Am.*,
  148 F.2d 416 (2d Cir. 1945) .............................................................. 19

*United States v. Microsoft Corp.*, 253 F.3d 34
  (D.C. Cir. 2001) (en banc) (per curiam) ...................................... 12, 14

*United States v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990) ............................................................ 21

*Verizon Commc'ns Inc. v. Law Offices of
  Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ................................... 12

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*,
  546 U.S. 164 (2006) .......................................................................... 13

*Westlake Servs., LLC v. Credit Acceptance Corp.*,
  No. 15-07490 (C.D. Cal. Dec. 7, 2015) .......................... 11, 16, 18, 19

*Weyerhaeuser Co. v. Ross–Simmons
  Hardwood Lumber Co.*, 549 U.S. 312 (2007) .............................. 15, 16

**Statutes**

California Civil Code § 3294 .................................................................. 8

Cartwright Act ............................................................................. *passim*

Clayton Act .......................................................................................... 2

Sherman Act ................................................................................ *passim*

**Other Authorities**

Federal Rule Civil Procedure 8(a)..................................................................... 9

Federal Rule Civil Procedure 12(b)(6)....................................................... 9, 24, 25

Federal Rule Evidence 201(b)...................................................................... 6

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law...................................... 20

**PRELIMINARY STATEMENT**

FashionPass has fallen far short of fixing the major deficiencies in its Original Complaint that led this Court to dismiss that pleading. The First Amended Complaint ("FAC") is a complete "redo" of FashionPass's pleading by a third set of new counsel who sought unsuccessfully to defend Rent the Runway ("RTR") in this case. Even with the benefit of Court-authorized pre-complaint discovery, the new prolixity is an attempt to mask: (i) FashionPass's abandonment of key allegations and claims it made in the Original Complaint in a transparent effort to circumvent this Court's ruling that FashionPass must plead *plausible factual allegations of market-wide harm to competition*, not mere alleged harm to a competitor; (ii) FashionPass's attempt to mislead the Court that it is challenging a *limited right of first opportunity*, not contracts that require 100% exclusivity; and (iii) the absence of any non-conclusory allegation that RTR had *knowledge of specific FashionPass contracts* that were allegedly interfered with. For the reasons set forth below, FashionPass's flip-flopping and pleading tactics fail. This case was brought by an alleged competitor improperly to gain a leg up in the marketplace and this fishing expedition of a lawsuit remains in search of a viable theory. The time has come for it to end.

*First*, five of the six claims fail because FashionPass has not and cannot plead any cognizable competition claim. As with the Original Complaint, the UCL (Count VI) and tortious interference with prospective relation claims (Counts III and IV), are derivative of FashionPass's antitrust claims (Counts I and II).  FashionPass's inability to plead a Cartwright Act claim already led this Court to dismiss the UCL and interference with prospective relation claims.  Dkt. No. 27 at 6-8. The same result is warranted for the FAC because FashionPass ignored this Court's guidance.

**No Harm to Competition:** As this Court told FashionPass in dismissing the Cartwright Act claim in the Original Complaint, FashionPass must plead plausible "allegations of harm to the market, or competition generally." Dkt. No. 27 at 5. Incredibly, despite all of the FAC's bluster, there is *not* a concrete factual allegation

1   of prices increasing or output or service quality decreasing. These necessary

2   allegations are conspicuously absent because FashionPass chose to drop its

3   Cartwright Act claim—the heart of the Original Complaint— under the misguided

4   belief that harm to competition is not required with respect to the newly minted

5   Sherman Act claims. FashionPass's new counsel admitted to this gamesmanship in

6   writing prior to the parties' meet and confer on RTR's Motion to Dismiss. Controlling

7   Supreme Court precedent, however, makes clear that to bring a private right of action

8   under the Clayton Act to enforce the Sherman Act, FashionPass *must* plead harm to

9   competition. This deficiency on a required element is fatal to the Sherman Act claims.

10  Flip-flopping legal theories, from the Cartwright Act based on supposed concerted

11  action between RTR and certain fashion brands to Sherman Act Section 2 claims

12  based on RTR's unilateral conduct with certain fashion brands, cannot save the FAC.

13  FashionPass is challenging the decision of some brands to sell products through

14  RTR. How a manufacturer distributes its products to consumers (e.g., by itself,

15  through multiple or preferred retailers, etc.) is a customary decision in every industry.

16  It is settled that the primary purpose of the antitrust laws is to promote competition

17  between brands, or *inter*-brand competition, not competition within a brand, or *intra*-

18  brand competition. The FAC turns this bedrock antitrust principle on its head and

19  underscores that this lawsuit alleges no harm to *competition*.

20  **No Substantial Foreclosure:** In dismissing the Cartwright Act claim, this

21  Court explained that to challenge "exclusive dealing arrangements," FashionPass

22  must plead facts showing that they "will foreclose competition in a *substantial share*

23  of the affected line of commerce." Dkt. No. 27 at 5 (emphasis added). At a subsequent

24  conference, this Court went further and told FashionPass it cannot "bring [an antitrust

25  claim] just on the basis of the fact that there may be one or two [exclusive contracts]"

26  because it "ha[s] to define what it is in terms of the market that is being adversely

27  affected." Dkt. No. 35 at 5:21-25. The FAC falls far short here, too.

28

Critically, the FAC reveals that, what FashionPass has labeled in conclusory fashion as alleged "exclusive contracts" between RTR and certain fashion brands, are **not exclusive**. FashionPass admits (as it must) that RTR has a limited right of first opportunity ("ROFO") on a clothing item-by-item basis with a short 14-day window to exercise its purchase option, and FashionPass does not allege how often RTR has exercised the ROFO, if at all. Nevertheless, the FAC elsewhere asserts, with no factual support, that RTR has imposed a 100% exclusivity requirement. Rank speculation and conclusory language, now belied by FashionPass having incorporated the ROFO provision into the FAC, is boilerplate pleading that is properly ignored under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) and its progeny, and cannot show "substantial foreclosure" of any market.

Worse, FashionPass alleges that RTR has a ROFO with "***many***" of only **22 fashion brands** FashionPass chooses to buy from. But FashionPass fails to identify what percentage of these brands' clothing items is supposedly "foreclosed." That is the proper test of FashionPass's alleged foreclosure from the ROFO, yet the FAC contains no allegation to this effect whatsoever. Incredibly, FashionPass's own website (which FashionPass again incorporates by reference) lists rental clothing items from **over half** of the 22 fashion brands it claims are subject to "exclusivity" with RTR. Even assuming *arguendo* RTR had 100% exclusivity with those brands (which it does not), this represents only 25% of the 88 brands FashionPass works with. The FAC also fails to allege how other rental competitors (e.g., Nuuly, Armoire, Le Tote, Gwynnie Bee, and Bloomingdale's) have been impacted by RTR's supposedly exclusive contracts. And tellingly, FashionPass does not and cannot allege that any of those 22 fashion brands—out of the entire universe of fashion brands (which FashionPass conspicuously omits)—are "exclusive" to RTR.   Thus, FashionPass's alleged "foreclosure" is not even close to showing "substantial foreclosure," along with other admittedly absent factors, like barriers to entry.

**No Monopoly Power:** FashionPass's Sherman Act Section 2 claims are also deficient because the FAC does not plausibly allege monopoly power or attempted monopoly power. FashionPass's baseless assertion that RTR has a 50% market share is insufficient as a matter of law to infer monopoly power. Courts require at least a 70% market share, even at the pleading stage. Like other conclusory assertions, this one is belied by FashionPass's other allegations, including that RTR has $100 million in revenue in a market segment growing to $2 billion by 2023 (with no corresponding allegation for 2019), which would represent a *5% market share*, excluding traditional retailers or resale outlets that are substitutes for fashion rental. That falls well below any test for attempted monopoly power, let alone monopoly power.  On top of that, FashionPass tries to disavow its original allegation that there are *few barriers to entry*, but basic procedural law does not allow a party to sanitize admissions in prior pleadings filed with the Court. This is important because well-settled antitrust law rejects monopolization claims where there are few barriers to entry and expansion.

**No Predatory Buying:** FashionPass's new challenge to RTR's conduct as a "predatory scheme to harm competition" is another reason to dismiss its Sherman Act Section 2 claims. The pejorative label "predatory" appears *18 times* in the FAC, but FashionPass did not plead (nor could it) any allegations that RTR is somehow implementing a predatory buying scheme. That would require RTR to submit artificially high bids to brands for their products to drive FashionPass out of business, leaving RTR to recoup its "predatory" investment. FashionPass's fanciful tale runs squarely into Supreme Court precedent requiring such elements be pled. These allegations are absent from the FAC, mandating dismissal on this basis, too.

*Second*, FashionPass's tortious interference claims (Counts III-V) fail because the ROFOs, to the extent brands accept a given RTR purchase order, expressly require brands to present opportunities to buy the very items in RTR's purchase orders to RTR *before contract formation* with another party. Thus, *as a matter of law*, RTR's limited ROFOs do not and could not interfere with FashionPass's existing contracts.

1   ***Third***, FashionPass's intentional interference with contract claim (Count V)

2   fails for the additional reason that, despite the leeway afforded by the Court in

3   granting FashionPass discovery before an operative complaint, FashionPass ***still*** has

4   not alleged any facts that plausibly demonstrate RTR ***actually knew*** of the specific

5   FashionPass purchase orders alleged in the FAC.

6        For all of these reasons, as explained further below, RTR respectfully requests

7   that the Court dismiss the FAC in its entirety with prejudice.

8                              **FACTUAL BACKGROUND[1]**

9   **I.   RTR IS A PIONEER IN THE FASHION INDUSTRY AND HAS A SUPERIOR OFFERING TO CONSUMERS**

10       Launched in 2009, RTR is a pioneer in the fashion industry. FAC ¶ 37. RTR

11  offers its customers a large assortment of women's designer clothing and accessories,

12  available for rent "at a fraction of the cost of buying the clothing with relatively

13  minimal time expended shopping." *Id.* ¶¶ 37-39. RTR primarily conducts its business

14  online. *Id.* ¶ 39. RTR also has several brick and mortar locations in the U.S., which

15  enable customers to conveniently try on, pick up, and drop off merchandise. *Id.* Its

16  platform appeals to a broad range of customers. *Id.* ¶ 39. Having introduced the idea

17  of fashion rental to the marketplace, RTR is now well-known in the industry. *Id.* ¶ 2.

18  According to FashionPass, RTR's financial capabilities are superior to those of

19  FashionPass, and RTR purchases more merchandise each season than FashionPass.

20  *Id.* ¶¶ 42, 45. FashionPass alleges that RTR does business with more than 550 brands

21  (FAC ¶ 45), corroborated by RTR's website which shows works with 600+ brands.

22  *See* Declaration of David R. Singh ("Singh Decl.") Exhibits ("Ex.") I (last visited

23  Sept. 8, 2019).[2]

24

25  ---

    [1] RTR accepts FashionPass's allegations as true for the purposes of this Motion only.
26  [2] The Court can consider information disclosed on the parties' websites on this motion
    to dismiss because the FAC expressly references and necessarily relies upon them in
27  describing each party's business. *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir.
    2006) ("A court may consider evidence on which the complaint necessarily relies if:
28  (1) the complaint refers to the document; (2) the document is central to the plaintiff's
    claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6)

1     FashionPass, which launched in 2016, is smaller and offers women's fashion

2    for rent through its website only. Compl. ¶ 17. FashionPass appeals to a narrower

3    customer base than RTR, marketing primarily to women in their 20s and 30s. *Id.* ¶¶

4    14-15. FashionPass alleges that works with 88 brands (FAC ¶ 45), but its own website

5    shows that FashionPass actually works with 122 brands. *See* Singh Decl. Ex. J (last

6    visited Sept. 8, 2019).[3]

7  **II.    THE "FASHION RENTAL BUSINESS" MARKET**

8     FashionPass claims that the relevant market is the "fashion rental business,"

9    which it defines as "the market for fashion rentals" in which "[p]articipants . . .

10  purchase clothing from fashion brands and then allow customers to rent that clothing

11  for special events, work, and casual wear through subscriptions or one-off rentals,

12  thereby allowing customers to rent designer and sought-after brand clothing for

13  temporary use". FAC ¶¶ 34-35. FashionPass previously alleged that "manufacturers .

14  . . do not distinguish between Fashion Rental Companies and traditional retail sellers"

15  and that "[t]here are few barriers to enter the Fashion Rental Business." Compl. ¶ 11.[4]

16  FashionPass now alleges a single "*de facto*" barrier to entry: the existence of RTR's

17  22 ROFO arrangements. FAC ¶¶ 54, 57.[5] It alleges no barriers to expansion.

18

---

19  motion.") (internal quotation marks omitted). In the alternative, RTR requests that the
Court take judicial notice of the cited information on the parties' websites because it

20  is not reasonably subject to dispute. Fed. R. Evid. 201(b). *See Knievel v. ESPN*, 393
F.3d 1068, 1076 (9th Cir. 2005) (taking judicial notice of portions of a party's website

21  that were not specifically alleged in the complaint); *Alexander v. Metro-Goldwyn-
Mayer Studios, Inc.*, No. CV 17-3123-RSWL-KSX, 2017 WL 5633407, at *4 (C.D.

22  Cal. Aug. 14, 2017) (granting request for judicial notice of website referred to in the
complaint). "A court need not accept as true allegations in a complaint that contradict

23  or are inconsistent with judicially-noticed facts." *Chapman v. Abbott Labs.*, 930 F.
Supp. 2d 1321, 1323 (M.D. Fla. 2013).

24  [3] *See supra* n.2.
[4] The Original Complaint defines a "Fashion Rental Company" as a merchant in the

25  Fashion Rental Business. Compl. ¶ 9.
[5] "Where allegations in an amended complaint contradict those in a prior complaint,

26  a district court need not accept the new alleged facts as true, and may, in fact, strike
the changed allegations as false and sham." *Harbridge v. Schwarzenegger*, No. CV

27  07-4486-GW SH, 2011 WL 6960830, at *8 (C.D. Cal. Aug. 31, 2011) (internal
quotation marks omitted), *adopted sub nom. by Harbridge v. Sumpter*, 2012 WL

28  33176 (C.D. Cal. Jan. 5, 2012) (Wu, J.).

To secure inventory at wholesale, fashion retailers place purchase orders with brands each season for certain merchandise. *Id.* ¶¶ 34, 39. There are multiple fashion seasons per year and fashion retailers purchase merchandise 3 to 4 months ahead of each season. Compl. ¶ 21-22.

### III.   FASHIONPASS'S ALLEGED INABILITY TO COMPETE

FashionPass alleges that RTR engaged in an anticompetitive scheme and conspiracy to eliminate competition from FashionPass, a relatively new market entrant and inefficient rival. *See* FAC ¶¶ 41-44. FashionPass claims that RTR used "right [of RTR] of first opportunity" contractual provisions[6] to make "demand[s]" to "FashionPass's most valuable brands," stating that "that unless the manufacturers grant an exclusive right to buy to RTR, sign their exclusionary terms and conditions of purchase, and refuse to sell merchandise to competing fashion rental companies, including FashionPass, RTR would not purchase any merchandise from those manufacturers or would substantially reduce either the volume or price terms pursuant to which it would make such purchases." *Id.* ¶¶ 26, 43.

FashionPass identifies 22 brands out of the 88 it allegedly stocks, and alleges RTR communicated a "coercive threat," which caused "many of these brands" and showroom representatives to "accede to RTR's demands that it be their exclusive customer in the fashion rental business and/or refused to sell merchandise to RTR's competitors". *Id.* ¶¶ 44, 51, 52. FashionPass further alleges RTR "demanded and received detailed information about FashionPass and other competitors" "in the course of its negotiations with brands regarding rental exclusivity". *Id.* ¶ 50. It goes on, "[b]y entering into rental exclusivity with these brands, or using other coercive tactics in an attempt to foreclose FashionPass's access to these suppliers, RTR caused" Blank NYC, Elliatt, Flynn Skye, ASTR the Label, and Yumi Kim ("Purchase

---

[6] Because FashionPass takes issue with and relies upon the ROFO provision (*see supra* n.2), which it has reviewed as part of the Court-authorized discovery, FashionPass has incorporated it by reference into the FAC. To assist the Court, RTR attaches an example of its terms and conditions and purchase order that embody the ROFO provision. *See* Singh Decl. Exs. A and D, respectively.

Order Manufacturers") "to breach their contracts with FashionPass." *Id*. ¶¶ 98-99. Absent is any allegation regarding how often, if it all, RTR exercised its ROFO or concerning FashionPass's inability to match an offer to buy the specific fashion items that the brands declined to sell them due to RTR's ROFOs.

## IV. PROCEDURAL HISTORY

FashionPass initially asserted claims under the Cartwright Act (Count I), California's unfair competition law ("UCL") (Count II), and for tortious interference with contract (Count III) and intentional interference with prospective economic advantage (Count IV) pursuant to California Civil Code § 3294. The Court tentatively dismissed the Original Complaint in its entirety on June 24, 2019. Dkt. No. 27. Notably, the Court dismissed the Original Complaint on the ground that,"[a]lthough Plaintiff alleges economic harm to itself," it had not alleged "harm to the market, or competition generally". Dkt. No. 24 at 5 (citing *NorthBay HealthCare Grp., Inc. v. Kaiser Found. Health Plan, Inc*., 305 F. Supp. 3d 1065, 1073 (N.D. Cal. 2018)).

On July 11, 2019, the Court held a scheduling conference and officially adopted its tentative ruling, granting FashionPass leave to amend and ordering RTR to produce discovery as to FashionPass's dismissed tortious interference claims. Dkt. No. 33. At this conference, the Court also warned FashionPass that it ought not to "*bring the Cartwright just on the basis of the fact that there may be one or two* [alleged exclusive agreements]. *There has to be something else, and you also have to define what it is in terms of the market that is being adversely affected*." Dkt. No. 35 at 5:21-25; *see also id*. at 6:25-8:13 ("[T]he mere fact that there is exclusive agreement does not necessarily establish a Cartwright Act violation. . . . Your client can't go to the defendant and say, I want this stuff at this point in time unless your client does some initial leg work to establish a basis for making that type of claim.").

After the Court's discovery order, FashionPass's initial two sets of counsel withdrew from the case.  Unhappy with the Court's discovery order, FashionPass's third set of counsel filed an *ex parte* application seeking additional time to file its

1   FAC and leave to compel RTR to produce information exceeding the scope of the
2   Court-authorized discovery. Dkt. No. 47. RTR opposed the request for extraordinary
3   relief, Dkt. No. 48, and this Court denied the request. Dkt. No. 49.

4       On August 27, 2019, FashionPass filed the FAC through its new counsel. Dkt.
5   50. FashionPass chose not to provide the Court with a redline of the FAC to the
6   Original Complaint presumably to mask the wholesale rewriting of the lawsuit and
7   reversals of prior allegations. RTR has attached a redline to its Motion to Dismiss.
8   Singh Decl. Ex. B. The notable flip-flopping and omissions in the FAC exposed in
9   connection with the dismissal of the Original Complaint include FashionPass:

10      • Abandoning its claim under the Cartwright Act (former Count I);
11      • Adding claims not in the Original Complaint: monopolization and attempted
12        monopolization under Sherman Act Section 2 (Counts I and II, respectively)
13        and negligent interference with prospective economic relations (Count IV);
14      • Dropping the allegation of "few barriers to enter the Fashion Rental
15        Business," instead alleging the 22 ROFOs at issue constitute "a *de facto*
16        barrier to entry for potential new entrants and existing [*sic*] competitors"
17        (*Compare* Compl. ¶ 11 *with* FAC ¶ 54);
18      • Omitting any allegation that FashionPass faces any barriers to expansion;
19      • Hiding from this Court the purchase orders at issue for Count V; and
20      • Omitting its damages estimates.

21                      **LEGAL STANDARD**

22      A complaint fails to satisfy Rule 8(a) and warrants dismissal under Rule
23   12(b)(6) when it does not "contain sufficient factual matter, accepted as true, to 'state
24   a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678
25   (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To state
26   facially plausible claim, plaintiffs must "plead[] factual content that allows the court
27   to draw the reasonable inference that the defendant is liable for the misconduct
28   alleged." *Iqbal*, 556 U.S. at 678. Courts will not accept pleadings that offer mere

1    "labels and conclusions" because "a formulaic recitation of the elements of a cause

2    of action will not do." *Twombly*, 550 U.S. at 555. A plaintiff must "raise a right to

3    relief above the speculative level." *Id.* This standard demands "more than a sheer

4    possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Further,

5    "[d]etermining whether a complaint states a plausible claim for relief will . . . be a

6    context-specific task that requires the reviewing court to draw on its judicial

7    experience and common sense." *Id.* at 679.

8

                                        **ARGUMENT**

9

10   **I.    FASHIONPASS'S MONOPOLIZATION, ATTEMPTED
            MONOPOLIZATION, UCL, AND TORTIOUS INTERFERENCE WITH
11          PROSPECTIVE ECONOMIC ADVANTAGE CLAIMS FAIL FOR
            LACK OF HARM TO COMPETITION**

12        FashionPass's monopolization, attempted monopolization, UCL, and tortious

13   interference with prospective economic advantage claims (Counts I-IV and VI) all

14   fail because it still cannot plead RTR maintained, or has a dangerous probability of

15   attaining, monopoly power through anticompetitive means, resulting in causal

16   antitrust injury to FashionPass. Critically, FashionPass continues to focus on harm to

17   itself rather than following the Court's instruction to "***define what it is in terms of the***

18   ***market that is being adversely affected***." Dkt. No. 35 at 5:21-25 (emphasis added).

19   The FAC reveals that FashionPass is not challenging "exclusive" contracts and there

20   are no allegations that the small number of brands FashionPass works with who have

21   given RTR a ROFO cannot and do not sell to the many *other fashion rental platforms*

22   (*e.g.*, Le Tote, Nuuly, Armoire). Further, FashionPass's allegations do not show that

23   RTR substantially foreclosed competition and thus maintained, or can attain,

24   monopoly power. Thus, FashionPass's tortious interference with prospective relations

25   and UCL claims likewise fail since they are predicated on the same allegations and

26   contrived theories that its own allegations and omissions reveal are implausible.

27        To state a monopolization claim under Sherman Act Section 2, FashionPass

28   must allege: (1) RTR possesses monopoly power in the relevant market; (2) RTR has

1   willfully acquired or maintained that power; and (3) RTR's conduct has caused

2   antitrust injury. *SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d

3   780, 783 (9th Cir. 1996) (affirming grant of motion to dismiss monopolization and

4   attempted monopolization claims); *Westlake Servs., LLC v. Credit Acceptance Corp.*,

5   No. CV1507490SJOMRWX, 2015 WL 9948723, at *4 (C.D. Cal. Dec. 7, 2015)

6   (granting motion to dismiss Sherman Act Section 2 monopolization and attempted

7   monopolization claims). To state a claim for attempted monopolization, FashionPass

8   must allege: (1) RTR specifically intended to control prices or destroy competition;

9   (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) a

10  dangerous probability of success; and (4) causal antitrust injury. *Id.*

11  ### A.   FashionPass Still Cannot Plead Harm to Competition

12          FashionPass still cannot plausibly allege that it has suffered the type of harm the

13  antitrust laws seek to prevent—*i.e.*, harm to competition. *See* Dkt. 24 at 5 (citing

14  *NorthBay HealthCare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 305 F. Supp. 3d

15  1065, 1073 (N.D. Cal. 2018) (dismissing Sherman Act Section 2 claims where

16  plaintiff did "not allege any antitrust injury or harm to competition generally."). In an

17  attempt to address the glaring deficiency in its Original Complaint, FashionPass

18  baldly alleges that RTR "methodically raised fashion rental subscription prices to

19  consumers" and "reduc[ed] output, by restricting rentals only of those items that RTR,

20  in its discretion, elects to buy and then offer for rental." *See* FAC ¶¶ 3, 12.

21          FashionPass's allegations of supracompetitve prices and output suppression are

22  conclusory and speculative. FAC ¶ 26. Tellingly, FashionPass does not even allege

23  what RTR's prices are, nor those of itself or other fashion rental retailers.

24  Monopolization claims with such hollow support cannot be sustained. *See Eastman*

25  *v. Quest Diagnostics Inc.*, 108 F. Supp. 3d 827, 835 (N.D. Cal. 2015) (granting motion

26  to dismiss monopolization claim where plaintiff alleged defendant's exclusionary

27  conduct allowed it to charge "above-competitive prices" but did not allege

28  defendant's prices or "how they compare to competitive prices"). In any event, high

prices without anticompetitive conduct is not an antitrust violation. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

FashionPass implicitly alleges RTR's competitive intelligence and enforcement of the ROFO terms harmed competition. FAC ¶¶ 18, 42, 50. This is erroneous because "to be condemned as exclusionary, a monopolist's act must . . . harm the competitive process and thereby harm consumers." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (per curiam). FashionPass plainly cannot show harm to competition resulting from its allegations that "at most allege potential harm only to [FashionPass]". *Maximum Availability Ltd. v. Vision Sols., Inc.*, No. CV 10-1488-GW(RZX), 2010 WL 11508470, at *4 (C.D. Cal. Dec. 16, 2010) (Wu, J.). To the extent FashionPass speculates "on information and belief" that RTR targeted others (FAC ¶¶ 16, 18, 50), speculative allegations do not suffice at the pleading stage. *See Eastman*, 108 F. Supp. 3d at 835. FashionPass merely alleges that RTR obtained the very information it contracted for before deciding whether to exercise its purchase rights. *See id.* ¶ 50.

FashionPass does not and cannot allege a reduction in ***overall market-wide*** output of the few brands it has identified. The absence of this allegation is a conspicuous omission in light of the Court's admonishment that FashionPass must "do[] some initial leg work to establish a basis for making that type of claim" (Dkt. 35 at 8:12-13), and the fact that FashionPass has had access to RTR's internal documents. *See Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

At most, FashionPass alleges that certain brands are selling more through RTR than itself. That is a classic *intra*-brand vertical restraint that is not a cognizable antitrust harm. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007) ("[T]he primary purpose of the antitrust laws is to protect [interbrand] competition"); *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164,

181 (2006) (rejecting claim of vertical price discrimination amongst dealers because such vertical restraints may result in a "simultaneous reduction of intrabrand competition and stimulation of interbrand competition") (quoting *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 51 (1977)); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 997 (N.D. Cal. 2015) (dismissing complaint alleging vertical restraints harmed competition merely because plaintiffs alleged harm to themselves). From the face of the FAC, there can be no dispute the 22 ROFOs, at most, impact how those 22 brands distribute their clothing to consumers. This stimulates competition *between fashion brands* in terms of how they want to distribute their clothing to consumers; *e.g.*, through one or more fashion rental companies, directly themselves, or some combination thereof. Notably, FashionPass does not even allege how the market shares or number of competitors in the alleged market have been affected by the ROFOs. For example, conspicuously absent from the FAC is any allegation that the handful of brands who work with FashionPass and who granted RTR a ROFO do not and cannot continue to sell some or all items to FashionPass or any *other fashion rental companies*.[7] Thus, FashionPass "at most allege[s] harm to [] competitors, not to competition." *Eastman*, 108 F. Supp. 3d at 836-37 (granting motion to dismiss monopolization claim for failure to allege substantial foreclosure "without accounting for other players").

In sum, FashionPass's inability to plead harm to competition is fatal to its antitrust, UCL, and interference with prospective economic advantage claims.

## B.   FashionPass Still Cannot Plead Substantial Foreclosure

In addition to harm to competition, FashionPass must plausibly allege the ROFOs somehow "foreclose[d] competition in a *substantial* share of the line of commerce affected." *Eastman*, 108 F. Supp. 3d at 834 (granting motion to dismiss

---

[7] FashionPass could not make any such allegation consistent with the Rules. Of the 22 brands identified by FashionPass, 8 are listed on the websites of one or more of Le Tote, Nuuly, Armoire, and Gwynnie Bee.  *See* Singh Decl. Exs. E, F, G, and H (all last visited Sept. 8, 2019). *See supra* n.2.

1  monopolization claim, finding no foreclosure where the elimination of three

2  competitors, without allegations pertaining to their market shares or number of

3  competitors in the market, at most constituted harm to competitors, not competition).

4  "[T]he opportunities for other traders to enter into or remain in that market must be

5  significantly limited." *Id.* at 834-35; *see also Microsoft*, 253 F.3d at 69 ("Because an

6  exclusive deal affecting a small fraction of a market clearly cannot have the requisite

7  harmful effect upon competition, the requirement of a significant degree of

8  foreclosure serves a useful screening function.").

9         FashionPass fails to allege the ROFOs are "exclusive arrangements" that

10  foreclose ***any*** competition, as they do not have the requisite "practical effect" of

11  preventing the brands from using competing services. *See Tampa Elec. Co. v.*

12  *Nashville Coal Co.*, 365 U.S. 320, 326 (1961). As discussed, FashionPass's

13  allegations make no reference to the actual exclusion of fashion retail competitors.

14  This is no accident: by the ROFO's express terms, accepting brands are merely

15  required to first present the opportunity to purchase goods to RTR on an item-by-item

16  basis. Then, RTR has only a short 14-day window to exercise its purchase option. *See*

17  Singh Decl. Ex. A ¶ 11. FashionPass also does not allege how frequently RTR has

18  exercised the ROFO, if at all. Tellingly, FashionPass still boasts that it works with ***13***

19  of the 22 brands it alleges are foreclosed from the market. *See* Singh Decl. Ex. J. This

20  renders implausible any allegation of foreclosure, let alone substantial foreclosure,

21  required to state a claim. *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-

22  CV-05847-WHO, 2013 WL 5694452, at *12 (N.D. Cal. Oct. 18, 2013) (granting

23  motion to dismiss monopolization claim where plaintiff only alleged harm to

24  competitors, not substantial foreclosure of competition); *Eastman*, 108 F. Supp. 3d at

25  834-37 (same).

26         Even if FashionPass could allege foreclosure, which it cannot, FashionPass

27  does not plausibly allege that RTR's ROFOs ***substantially*** foreclosed competition in

28  the alleged fashion rental market. It claims that RTR coerced "***many***," not all, of the

22 brands into accepting the ROFOs. FAC ¶ 52. But even all 22 brands represent *at most 4% of RTR's portfolio of brand offerings* and *at most 25% of FashionPass's portfolio of brand offerings*. *See* FAC ¶ 45 (alleging RTR does business with 550 clothing brands while FashionPass partners with 88 clothing brands).[8] FashionPass further admits these brands cover only 30% of its own revenues., which is far from substantial. *See Rheumatology Diagnostics*, 2013 WL 5694452, at *12 (dismissing complaint, finding foreclosure level of less than 30 percent insufficient in Sherman Act Section 2 exclusive dealing case). Surely, such allegations of *de minimis* "foreclosure" do not rise to the level of *substantial* foreclosure, especially where FashionPass makes no reference to the many thousands of women's fashion brands that are not currently carried by either party. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 329 (1962) (As a matter of law, "foreclosure of a *de minimis* share of the market will not tend 'substantially to lessen competition.'"); Dkt. 13-1 at 12-13 (citing *Tampa Elec.*, 365 U.S. at 328 ("[T]he competition foreclosed by the contract must be found to constitute a substantial share of the relevant market.")).

FashionPass does not allege RTR foreclosed competition via predatory bidding from the 22 brands. To plead such a claim, FashionPass must allege the predatory bidding led to below-cost pricing of RTR's outputs, and that RTR has a dangerous probability of recouping the losses incurred in bidding up input prices through the exercise of monopsony power. *See Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*, 549 U.S. 312, 318 (2007). FashionPass has admitted it is not alleging a predatory pricing claim. *See* Singh Decl. Ex. C.

In sum, FashionPass has not, and cannot, allege RTR maintained a monopoly by substantially foreclosing competition through exclusionary means.

---

[8] The ratios fare no better when compared to the parties' brand offerings listed on their websites. *See supra* n.2. Simple math shows that the "foreclosure" numbers translate to about 3% of RTR's brand offerings and 18% of FashionPass's brand offerings. FashionPass's website also shows that it works with 13 of the 22 brands it now alleges are refusing to sell to it due to the ROFOs with RTR. *See* Singh Decl. Exs. I and J (last visited Sept. 8, 2019).

1

### C.  FashionPass Cannot Plausibly Show RTR Maintained, or Has a Dangerous Probability of Acquiring, Monopoly Power

2

Controlling authority makes clear that monopoly power is a substantial degree

3

of market power; *i.e.*, the power to exclude competition or control prices. *See*

4

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-CV-05847-JST, 2013 WL

5

3242245, at *14 (N.D. Cal. June 25, 2013); *see also AD/SAT v. Associated Press*, 181

6

F.3d 216, 227 (2d Cir. 1999) (defining monopoly power as "the ability '(1) to price

7

substantially above the competitive level *and* (2) to persist in doing so for a significant

8

period without erosion by new entry or expansion.'") (emphasis in original).

9

FashionPass must allege monopoly power by way of either direct evidence or

10

circumstantial evidence. *See Westlake Servs.*, 2015 WL 9948723, at *6.

11

As an *initial* matter, FashionPass alleges RTR, as a buyer of inputs, exercised

12

its market power over brands upstream (*see* FAC ¶¶ 4, 7), yet it does not allege RTR

13

has **any degree** of monopsony power. *See Weyerhaeuser*, 549 U.S. at 320 ("[A]

14

monopsony is to the buy side of the market what a monopoly is to the sell side and is

15

sometimes colloquially called a 'buyer's monopoly.'"). FashionPass's allegation that

16

RTR has 50% market share in "fashion rental market" (sell side/customer-facing) says

17

nothing about the share of brands it carries relative to other fashion retailers vying for

18

the same supply (buy side/brand-facing). FashionPass admitted as much in its

19

Original Complaint. Compl. ¶ 11 ("[M]anufacturers supplying garments at wholesale

20

to retail merchants in the fashion industry do not distinguish between Fashion Rental

21

Companies and traditional retail sellers . . . ."). It must allege dominant market power

22

in the *relevant* market, not just any market. *Rheumatology Diagnostics*, 2013 WL

23

5694452, at *14; *cf. Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018)

24

(cautioning that without an accurate market definition, there is no way to determine

25

to measure defendant's ability to lessen competition). Yet, FashionPass makes no

26

attempt to link how any market power RTR has in a seller's market confers upon it

27

market power over brands in a separate buyer's market. In this regard, FashionPass's

28

claim that RTR "coerced" brands is implausible and does not meet the threshold

1   requirement that antitrust claims make economic sense. *Cf. Adaptive Power Sols.,*

2   *LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998). Tellingly,

3   FashionPass does not allege whether RTR ever exercised its ROFO rights or refused

4   to purchase from a brand that did not agree to the ROFO.

5

6   **1.   FashionPass Does Not Plausibly Allege Direct Evidence of Monopoly Power**

7       FashionPass has failed to plausibly allege any facts bearing on direct evidence

8   of monopoly power, such as restricted output and supracompetitive prices. *See Sidibe*

9   *v. Sutter Health*, 4 F. Supp. 3d 1160, 1180 (N.D. Cal. 2013). Without plausible

10  allegations of ***both***, FashionPass cannot plausibly allege direct evidence of monopoly

11  power. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

12      FashionPass alleges that the ROFOs "reduc[e] output, by restricting rentals

13  only of those items that RTR, in its discretion, elects to buy and then offer for rental."

14  FAC ¶ 12. But FashionPass does not allege reduction in ***overall market-wide*** output

15  of the few brands it has identified because these brands are available to women

16  through means other than rental. At most, FashionPass alleges that certain brands are

17  selling more through RTR than itself, which is not a cognizable harm. *See supra* at

18  11-13. Further, FashionPass's allegation is belied by the ROFO itself, which makes

19  plain that it applies on a per item basis. *See* Singh Decl. Ex. A. Items that RTR

20  declines to buy, or that the brands decline to sell to RTR, are expressly excluded. *Id.*

21      FashionPass's allegation of increased prices fares no better. It claims that, by

22  reason of the ROFOs, "consumers have . . . been forced to pay, and will in the future

23  pay, anticompetitive prices for rentals to obtain desired brands." FAC ¶ 12.  This is

24  entirely conclusory. FashionPass does not discuss any fashion rental company's

25  pricing in the FAC. Conclusory assertions do not suffice as direct evidence of

26  monopoly power. *See Eastman*, 108 F. Supp. 3d at 835 (rejecting conclusory

27  allegation that defendant charged supracompetitive prices); *Bay Area Surgical Mgmt*,

28  166 F. Supp. 3d at 997 (same); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*,

1   No. 1:13–cv–00740, 2013 WL 6682981, at *6 (E.D. Va. Dec. 18, 2013) (same).

2           **2.     FashionPass Does Not Plausibly Allege Circumstantial Evidence of Monopoly Power**

3           To put forth a circumstantial evidence theory of monopoly power, FashionPass

4   must allege facts that: "(1) define the relevant market, (2) show that the defendant

5   owns a dominant share of that market, and (3) show that there are significant barriers

6   to entry and show that existing competitors lack the capacity to increase their output

7   in the short run." *Sidibe*, 4 F. Supp. 3d at 1180. It has failed to do so.

8           First, FashionPass maintains an implausibly narrow view of the alleged

9   relevant market that is "unsustainable on its face." *Ojmar U.S., LLC v. Sec. People,*

10  *Inc.*, No. 16-cv-04948-HSG, 2017 WL 3301214, at *6 (N.D. Cal. Aug. 2, 2017). The

11  relevant market must encompass the product at issue and all of its economic

12  substitutes, since "[t]he outer boundaries of a product market are determined by the

13  reasonable interchangeability of use or the cross-elasticity of demand between the

14  product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325. Like the Original

15  Complaint, the FAC presents ***no allegation*** regarding cross-elasticity of demand, nor

16  potential economic substitutes, such as the fashion retailers it identifies in its FAC.

17  *See* FAC ¶ 6; *Westlake Servs.*, 2015 WL 9948723, at *5 (dismissing monopolization

18  claim where complaint "contain[ed] no allegations regarding whether the software

19  products in this market are reasonably interchangeable or whether there is cross-

20  elasticity of demand for [the] products").

21          Second, FashionPass does not allege sufficient facts to make it plausible that

22  RTR holds a dominant market share. In fact, it merely contends, without citing any

23  factual support, that "RTR presently controls at least 50% of the domestic fashion

24  rental market, whether measured by revenues or subscribers." FAC ¶ 5. Controlling

25  and persuasive case law holds that while a market share of ninety percent "is enough

26  to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be

27  enough; and certainly thirty-three per cent is not." *United States v. Aluminum Co. of*

28  *Am.*, 148 F.2d 416, 424 (2d Cir. 1945); *Exxon Corp. v. Berwick Bay Real Estates*

1    *Partners*, 748 F.2d 937, 940 (5th Cir. 1984) (per curiam) ("[M]onopolization is rarely

2    found when the defendant's share of the relevant market is below 70%.").

3            Facing this steep uphill battle, FashionPass speculates, based on "information

4    and belief, that the percentage is *likely* closer to 80% or 90%" and that "RTR's actual

5    market share can be more precisely calculated after discovery proceeds in the case."

6    FAC ¶ 5 (emphasis added). But speculative and conclusory assertions do not suffice

7    at the pleading stage. *See Eastman*, 108 F. Supp. 3d at 835 (rejecting conclusory and

8    speculative allegation that defendant charged supracompetitive prices); *Intellectual*

9    *Ventures I*, 2013 WL 6682981, at *6 (same). Without non-speculative and non-

10   conclusory allegations that RTR possessed a dominant market share above 70%,

11   FashionPass cannot plausibly allege RTR possessed monopoly power. Far from

12   anywhere close to 70%, its conclusory assertion that RTR has a 50% share (FAC ¶¶

13   5, 36), is belied by its other allegation that RTR only earns $100 million in revenue

14   in a market trending toward $2 billion by 2023 (FAC ¶¶ 3, 8) (with no corresponding

15   allegation for 2019), which would represent a *5% market share*. Of course, its

16   admission that the alleged market is trending at such a high growth rate *is entirely*

17   *inconsistent* with its allegations that "insurmountable barriers to entry" exist in the

18   market, FAC ¶¶ 53-59; *Westlake Servs.*, 2015 WL 9948723, at *6 (granting motion

19   to dismiss monopolization claim: "expansion by competitors would suggest that the

20   defendant during the expansion lacked the market power to control marketwide output

21   in the first place.") (quoting *Rebel Oil*, 51 F.3d at 1442). It is, however, consistent

22   with FashionPass's prior allegation that "[t]here are *few barriers to enter* the Fashion

23   Rental Business," Compl. ¶ 11 (emphasis added). Confirming the implausibility of

24   the FAC's abandonment of this key allegation, the very day the FAC was filed,

25   *another* fashion rental company, Le Tote, recently announced that it was purchasing

26   retail behemoth Lord & Taylor for $100 million. *See* Hudson Bay Company, Material

27   Change Report (SEDAR Form 51-102F3) (Aug. 27, 2019). Urban Outfitters recently

28   launched its competing rental service, Nuuly. *See* Urban Outfitters, Inc., Quarterly

1   Report at 22 (SEC Form 10-Q) (Jun. 10, 2019). The Rules do not countenance
2   FashionPass's attempt to abandon its admission and the Court should reject it.

3   Lastly, FashionPass has failed to state any facts that plausibly suggest RTR has
4   durable monopoly power. Allegations of a dominant market share do not speak to the
5   potential for rivals, actual or potential, to respond to a dominant firm's increase in
6   price or restriction of output. *See, e.g.*, Phillip E. Areeda & Herbert Hovenkamp,
7   Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶501 (3rd
8   and 4th Editions, 2019 Cum. Supp. 2010-2018) (the question is "whether the
9   defendant can price monopolistically without prompt erosion from rivals' entry or
10  expansion."). FashionPass alleges ***no facts*** regarding durability, *i.e.*, whether and for
11  how long RTR has maintained a 50% market share. Instead it reverses course after
12  previously alleging "[t]here are few barriers to enter the Fashion Retail Business"
13  (Compl. ¶ 11), and now omits this allegation and claims that ***a single barrier to entry***,
14  which it characterizes as "insurmountable", exists: RTR's 22 ROFOs which
15  purportedly "create a de facto barrier to entry for potential new entrants and existing
16  competitors [*sic*]." FAC ¶ 53-59. Again, FashionPass is bound by its previous
17  admission. *See supra* n.5. Further, its mention of a single barrier to entry (the 22
18  ROFOs) is insignificant and does not suffice, especially where FashionPass ***does not***
19  ***allege any expansion barriers***. *See Elecs. For Imaging, Inc. v. Coyle*, No. C 01-
20  4853MJJ, 2005 WL 1661958, at *3 (N.D. Cal. July 14, 2005) (granting motion to
21  dismiss monopolization and attempted monopolization claims in part because
22  plaintiff failed to allege "significant barriers to entry" or that "existing competitors
23  lack the capacity to increase their output in the short run") (citing *Townshend v.*
24  *Rockwell Int'l Corp.*, No. C99–0400SBA, 2000 WL 433505, at *12 (N.D. Cal. March
25  28, 2000)). FashionPass's assertion that it and existing competitors face entry barriers
26  is nonsensical because "[e]ntry barriers pertain *not to those already in the market, but*
27  *to those who would enter but are prevented from doing so*." *Optronic Techs, Inc. v.*
28  *Ningbo Sunny Elec. Co.*, No. 5:16-cv-06370-EJD, 2017 WL 4310767, at *9 (N.D.

Cal. Sept. 28, 2017) (emphasis added) (quoting *United States v. Syufy Enters.*, 903 F.2d 659, 671 n.21 (9th Cir. 1990)). "Barriers to expansion constrain 'the ability of existing firms to quickly increase their own output in response to a contraction by the defendant.'" *Id.* (quoting *Rebel Oil*, 51 F.3d at 1441). To the extent it suggests RTR's superior portfolio offering is an entry or expansion barrier, the Ninth Circuit has clearly rejected the notion that goodwill constitutes "an impediment to, rather than the natural result of, competition." *Syufy Enters.*, 903 F.2d at 669.

### 3.   FashionPass Cannot Plausibly Allege RTR Has A Dangerous Probability of Attaining Monopoly Power

"When the claim involves attempted monopolization, most cases hold that a market share of 30 percent is presumptively insufficient to establish the power to control price." *Rebel Oil*, 51 F.3d at 1438. FashionPass "must show that new rivals are barred from entering the market and [] that existing competitors lack the capacity to expand their output to challenge the predator's high price." *Id*. at 1439.

FashionPass cannot plausibly show RTR has a dangerous probability of achieving monopoly power. As discussed, FashionPass alleges RTR has as little as a 5% market share, *supra* at 19, and FashionPass has admitted "[t]here are few barriers to enter the Fashion Retail Business." Compl. ¶ 11. Moreover, its conclusory assertion that the ROFO is the ***single entry barrier*** fares no better because there is no mention of ***any barrier to expansion***. FAC ¶¶ 5, 54. "Without a better description of the purported entry barriers, the allegations are too conclusory to be entitled to an assumption of truth." *Optronic*, 2017 WL 4310767 at *9. Additionally, while FashionPass refers to other competitors (*see, e.g.*, FAC at ¶ 12, 42), "there are no corresponding statements explaining why those participants cannot increase their own output in response to a contraction by [RTR]." *Id*. (dismissing attempted monopolization claim because plaintiff failed to plead non-conclusory allegations of barriers to entry and expansion).

1   Without sufficient allegations of barriers to entry and expansion, FashionPass

2   cannot plausibly demonstrate RTR has a dangerous probability of achieving

3   monopoly power as a matter of law. Count II should therefore be dismissed.[9]

4
5

### D.   FashionPass's UCL and Tortious Prospective Economic Advantage Claims Fall with the Sherman Act Claims

6   FashionPass's UCL (Count VI) and tortious prospective economic advantage

7   claims (Counts III and IV) are purely derivative of its Sherman Act claims. Consistent

8   with this Court's previous ruling, these claims should be dismissed as premised upon

9   the same alleged conduct in Counts I and II and cannot survive without a plausible

10  showing that the conduct is wrongful. *See* Dkt. 27 at 6-8 (dismissing UCL and

11  intentional interference with prospective economic advantage claims as derivative of

12  FashionPass's Cartwright Act claim); *see also Bay Area Surgical Mgmt.*, 166 F. Supp.

13  3d at 998 (dismissing Cartwright Act and UCL claims as "predicated on the same

14  allegations and theories as the Sherman Act claim"); *Extreme Reach, Inc. v. Spotgenie

15  Partners, LLC*, No. CV 13-07563, 2014 WL 12781769, at *5 (C.D. Cal. Apr. 14,

16  2014) (granting motion to dismiss interference with prospective economic advantage

17  claim where plausible allegations of independently wrongful act was lacking); *Oser

18  Commc'ns Grp., Inc. v. Solar Energy Trade Shows*, No. SACV 12-01534, 2013 WL

19  12128817, at *5 (C.D. Cal. Feb. 22, 2013) (dismissing both intentional and negligent

20  interference claims because plaintiff failed to plead an independent wrongful act).

21  ## II.   FASHIONPASS'S TORTIOUS INTERFERENCE CLAIMS ARE LEGALLY DEFICIENT

22
23  FashionPass alleges that, by entering into "exclusive contract arrangements"

24  with certain clothing manufacturers, RTR interfered with FashionPass's Purchase

25  _____

26  [9] Count II also fails because its "allegations of specific intent are not connected to sufficient allegations of anticompetitive conduct." *Carefusion Corp. v. Medtronic, Inc.*, No. 10-CV-01111-LHK, 2010 WL 4509821, at *10 (N.D. Cal. Nov. 1, 2010)

27  (granting motion to dismiss: "Having found the allegations of anticompetitive conduct deficient, the Court will not infer specific intent based only on CareFusion's

28  conclusory allegations."); *see supra* at 11-16.

Orders with a subset of the manufacturers and prospective business opportunities with the 22 brands identified in its FAC. *See* FAC ¶¶ 64-67. As discussed *supra*, the deficiencies in FashionPass's Sherman Act claims preclude it from plausibly alleging wrongful conduct for purposes of Counts III, IV, and VI. Additionally, these tortious interference claims fail for the independent reasons set forth below.

### A.   FashionPass's Intentional Interference with Contract and Prospective Economic Advantage Claims Also Fail Because It Does Not Plausibly Plead RTR Intentionally Disrupted Any Relationships

As this Court identified in initially dismissing FashionPass's intentional interference with prospective economic advantage claim, the tort has five elements: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship; (3) intentional wrongful acts by the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant. Dkt. No. 27 at 7 (citing *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1108 (9th Cir. 2007)). In dismissing FashionPass's intentional interference with contract claim, the Court determined FashionPass must allege: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." Dkt. No. 27 at 6 (citing *United Nat'l Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014) (quoting *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990)). Neither standard is met here.

FashionPass alleges that **RTR** entered into "exclusive" contracts with the 22 brands at issue "with the intent to interfere with FashionPass's actual and prospective business relationships." FAC ¶ 88. However, FashionPass's allegation is purely conclusory and it fails to allege specific facts plausibly showing that RTR's alleged

1  conduct was coupled with any intent to interfere with FashionPass's current or future

2  business relationships. *See F.M. Tarbell Co. v. A & L Partners, Inc.*, No. CV 10–

3  1589, 2011 WL 1153539, at *4 (C.D. Cal. Mar. 23, 2011) (dismissing intentional

4  interference with prospective economic advantage claim under Rule 12(b)(6) for,

5  among other shortcomings, failure to "allege specific facts showing" damage to

6  business relationships that was "intentionally caused").

7         Moreover, facially the ROFO **terms** preclude any demonstration of intent to

8  interfere. Notably missing from the FAC is the precise language from RTR's ROFOs

9  that FashionPass has seen in Court-authorized discovery. This is no accident.

10  FashionPass knows very well that RTR's ROFO terms foster a business opportunity

11  for RTR that *operationally predates rivals' contract formation and business

12  relationships with the 22 brands*. That is, the ROFO terms expressly require that, to

13  the extent the brands accept an RTR purchase order containing the ROFO, the brands

14  present purchase opportunities covering the very items in such purchase orders to

15  RTR *before the brands form contractual or business relationships* with its rivals. *See*

16  Singh Decl. Ex. A. Accordingly, by their nature and implementation, the ROFOs are

17  not designed or negotiated with an intent to interfere with *any company's*

18  relationships.[10] *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119,

19  1127 (9th Cir. 2014) (intentional interference claims failed where there is no dispute

20  as to a timely and lawful exercise of right of first refusal rights). Counts III, IV, and

21  V should therefore be dismissed.

22

23

24

25  ───────────────

26  [10] FashionPass's conclusory allegations of RTR's intentions are particularly disingenuous given information it has view as part of the Court-authorized discovery afforded. Documents produced in discovery to date clearly demonstrate

27  RTR's adherence to brands' requests to fully perform already-accepted purchase order obligations with FashionPass prior to agreeing to any ROFO terms. RTR is

28  prepared to provide these documents to the Court upon its request.

**B.     FashionPass Fails to Allege Facts That Plausibly Demonstrate RTR Knew of Any Specific Contract Between FashionPass and the Purchase Order Manufacturers**

Even after the Court "grant[ed] Plaintiff leave to amend to the extent it can allege facts showing RTR's knowledge of the contracts at issue" (Dkt. 27 at 7), and despite Court-authorized **discovery**, FashionPass again makes only conclusory allegations regarding RTR's knowledge of unspecified purchase orders. FashionPass's sole allegation is that "[p]rior to entering into any exclusive arrangement through which at least [the five brands at issue] would sell fashion merchandise for rental only to RTR and not to FashionPass, RTR knew that FashionPass had existing purchase contracts with those brands." FAC ¶ 98. This allegation, and the more general allegations that RTR embarked on a "scheme" of soliciting FashionPass-related information from brands generally, still fail to "allege facts showing RTR's knowledge of the contracts at issue." Dkt. No. 27 at 7. This is fatal to FashionPass's intentional interference claim. *Id.* (citing *Swipe & Bite, Inc. v. Chow*, 147 F. Supp. 3d 924, 934-35 (N.D. Cal. 2015) (plaintiff's conclusory allegation of knowledge was insufficient to survive a motion to dismiss)); *name.space, Inc. v. Internet Corp. for Assigned Names & Nos.*, No. CV 12–8676, 2013 WL 2151478, at *8 (C.D. Cal. Mar. 4, 2013) (same), *aff'd*, 795 F.3d 1124 (9th Cir. 2015).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss FashionPass's FAC in its entirety with prejudice pursuant to Rule 12(b)(6).

Dated: September 8, 2019

Respectfully submitted,

WEIL, GOTSHAL & MANGES LLP

By: /s/ *David R. Singh*
    David R. Singh
    State Bar No. 300840
    David.Singh@weil.com
    Eric A. Rivas
    State Bar No. 324577
    Eric.Rivas@weil.com

**WEIL, GOTSHAL & MANGES LLP**
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1134
Telephone: (650) 802-3000
Facsimile: (650) 802 3100

Eric S. Hochstadt (*pro hac vice* pending)
Lauren A. Jacobson (*pro hac vice* pending)
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Lee S. Brenner
State Bar No. 180235
lsbrenner@Venable.com
Ken D. Kronstadt
State Bar No. 259996
kdkronstadt@Venable.com
**VENABLE LLP**
2049 Century Park East Suite 2300
Los Angeles, CA 90067
Telephone: (310) 229-9900
Facsimile: (310) 339-9901

*Attorneys for Defendant*
*Rent the Runway, Inc.*

## CERTIFICATE OF SERVICE

I declare that I am employed with the law firm of Weil, Gotshal & Manges LLP, whose address is 201 Redwood Shores Parkway, Redwood Shores, California 94065-1175 (hereinafter "WGM"). I am not a party to the within cause, and I am over the age of eighteen years. I further declare that on September 8, 2019, I served a copy of: DEFENDANT RENT THE RUNWAY, INC.'S NOTICE OF MOTION TO DISMISS THE FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM; MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT RENT THE RUNWAY INC.'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM; and [PROPOSED] ORDER

**BY OVERNIGHT DELIVERY** by placing a true copy thereof enclosed in a sealed envelope with overnight delivery fees provided for, addressed as follows, for collection by Federal Express at WGM in accordance with WGM's ordinary business practices. I am readily familiar with WGM's practice for collection and processing of correspondence for overnight delivery and know that in the ordinary course of WGM's business practice the document(s) described above will be deposited by an employee or agent of WGM in a box or other facility regularly maintained by Federal Express for collection on the same day that the document(s) are placed at WGM.

Chad S. Hummel (SBN 139055)
chummel@sidley.com
Anna Tutundjian (SBN 309969)
atutundjian@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: (310) 595-9505
Facsimile: (310) 595-9501

Executed on September 8, 2019, at Redwood Shores, California. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_/s/ Tracy Herrington_
Tracy Herrington