Chad S. Hummel (SBN 139055)
chummel@sidley.com
Anna Tutundjian (SBN 309969)
atutundjian@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: (310) 595-9505
Facsimile: (310) 595-9501

Tara Church (SBN 235385)
TChurch@tarachurchlaw.com
Law Offices of Tara Church, Esq.
13755 Bayliss Road, Second Floor
Los Angeles, California 90049
Telephone: (310) 529-1677

*Attorneys for Plaintiff*
*FashionPass, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FASHIONPASS, INC., | Case No.  2:19-03537-GW (JCx) |
| Plaintiff, | **PLAINTIFF FASHIONPASS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT RENT THE RUNWAY, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM** |
| vs. | |
| RENT THE RUNWAY, INC., | |
| Defendant. | |
| | Date:      October 7, 2019 |
| | Time:      8:30 a.m. |
| | Place:     Room 9D, 9th Floor |
| | Judge:     Hon. George H. Wu |

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................. 1

II.   FACTUAL ALLEGATIONS ............................................................ 2

III.  LEGAL STANDARD ...................................................................... 4

IV.   ARGUMENT ................................................................................... 5

  A.   FashionPass Sufficiently Alleges Actual and Attempted Monopolization ...................................................................... 5

    1.   RTR Possesses Monopoly Power in the Relevant Market ............. 5

      a.   FashionPass Sufficiently Defines the Relevant Market ........ 5

      b.   FashionPass Adequately Shows that RTR Owns a D.ominant Share of the Market ............................................. 6

      c.   FashionPass Alleges Significant Barriers to Entry ............... 8

    2.   RTR Has Acquired, Enhanced, or Maintained its Market Power By Exclusionary Conduct .................................................... 11

      i.   FashionPass Adequately Alleges Substantial Foreclosure .............................................................. 13

    3.   FashionPass Clearly Pleads Harm to Competition ....................... 17

  B.   FashionPass Adequately Alleges its Tortious Interference Claims ......... 20

    1.   FashionPass Plausibly Pleads that RTR Knew of Specific Contracts Between FashionPass and the Purchase Order Manufacturers and that RTR Intentionally Disrupted FashionPass's Business Relationships........................................... 22

  C.   FashionPass Adequately Allege Statutory Unfair Competition in Violation of California's UCL (California Business Professional Code §17200 .................................................................................. 23

  D.   Defendant RTR's Improperly Attached Exhibits Should be Stricken......................................................................................... 24

V.    CONCLUSION ................................................................................ 24

i

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

**Cases**

4

*3M Co. v. Appleton Papers*,
5
  35 F. Supp. 2d 1138 (D. Minn. 1999) ............................................................ 15

6
*Allen-Myland, Inc. v. IBM*,
  33 F.3d 194 (3d Cir. 1994) ............................................................................. 8

7
*Ashcroft v. Iqbal*,
8
  556 U.S. 662 (2009).......................................................................................... 4

9
*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985).......................................................................................... 5

10
*Authenticom, Inc. v. CDK Global, LLC* (*In re Dealer Mgmt. Sys. Antitrust Litig.*),
11
  313 F. Supp. 3d 931 (N.D. Ill 2018)............................................................ 4, 14

12
*Brantley v. NBC Universal Inc.*,
  675 F.3d 1192 (9th Cir. 2012) ................................................................. 17, 18

13
*Broadway Delivery Corp. v. UPS*,
14
  651 F.2d 122 (2d Cir. 1981) ........................................................................... 7

15
*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
  20 Cal. 4th 163 (1999) .................................................................................... 24

16
*Church & Dwight Co. v. Mayer Labs., Inc.*,
17
  No. C-10-4429 EMC, 2011 WL 1225912 (N.D. Cal. Apr. 1, 2011)................. 15

18
*Dean Foods Co. v. Food Lion, LLC*,
  135 S. Ct. 676 (2014)....................................................................................... 6

19
*Hamilton Materials Inc. v. Dow Chem. Corp.*,
20
  494 F.3d 1203 (9th Cir. 2007) ........................................................................ 4

21
*Hawthorne v. Umpqua Bank*,
  No. 11-cv-06700-JST, 2013 WL 5781608 (N.D. Cal. Oct. 25, 2013) ............. 24

22
*Hayden Publ'g Co. v. Cox Broad. Corp.*,
23
  730 F.2d 64 (2d Cir. 1984) ............................................................................. 7

24
*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
  627 F.2d 919 (9th Cir. 1980) ....................................................................... 7, 8

25
*Jensen Enterprises Inc. v. Oldcastle, Inc.*,
26
  No. C06-00247 SI, 2006 WL 2583681 (N.D. Cal. Sept. 7, 2006) .................. 9, 10

27
*Kentwool Co. v. NetSuite Inc.*,
  No. 14-cv-05264-JST, 2015 U.S. Dist. LEXIS 19982 (N.D. Cal. Feb. 18, 2015)11

28

ii

*Kische USA, LLC v. Simsek*,
  No. C16-0168JLR, 2016 WL 6273261 (W.D. Wash. June 29, 2016) ................ 23

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ................................................................... 24

*Luxpro Corp. v. Apple Inc.*,
  No. C10–03058 JSW, 2011 WL 1086027 (N.D. Cal. Mar. 24, 2011)................ 23

*M & M Medical Supplies & Service, Inc. v. Pleasant Valley Hospital, Inc.*
  981 F.2d 160 (4th Cir.1992) ..................................................................... 5

*Marder v. Lopez*,
  450 F.3d 445 (9th Cir. 2006) ............................................................. 4, 24

*Maximum Availability Ltd., v. Vision Sols., Inc.*,
  No. 10-1488, 2010 WL11508470 (C.D. Cal. Dec. 16, 2010) ........................... 18

*McWane, Inc. v. F.T.C.*,
  783 F.3d 814 (11th Cir. 2015) ........................................................... 18, 20

*Newcal Indus., Inc. v Ikon Office Solution*,
  513 F.3d 1038 (9th. Cir 2008) ............................................................. 5, 6

*Oahu Gas Serv., Inc. v. Pac. Res. Inc.*,
  838 F.2d 360 (9th Cir.1988) .................................................................... 11

*on Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
  166 F. Supp. 3d 988 (N.D. Cal. 2015)......................................................... 18

*PAE Gov't Servs., Inc. v. MPRI, Inc.*,
  514 F.3d 856 (9th Cir. 2007) ..................................................................... 1

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  562 F. Supp. 2d 392 (E.D.N.Y. 2008) .......................................................... 8

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.*,
  899 F.2d 951 (10th Cir.1990) ................................................................... 11

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ..................................................................... 9

*Retrophin, Inc. v. Questcor Pharm., Inc.*,
  41 F. Supp. 3d 906 (C.D. Cal. 2014) ...................................................... 5, 9

*Rheumatology Diagnostic Lab., Inc. v. Aetna, Inc.*,
  No. 12-05847, 2013 WL 5694452 (N.D. Cal. Oct. 18, 2013) (*Rheumatology II*) 16

*Sidense Corp. v. Kilopass Tech. Inc.*,
  No. 14-CV-02238-SI, 2015 WL 7759442 (N.D. Cal. Dec. 2, 2015) ................... 9

*Swartz v. KPMG LLP*,
  476 F.3d 756 (9th Cir. 2007) ..................................................................... 4

iii

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961)............................................................................ 18

*Twin City Sportservice, Inc. v. Charles O Finley & Co., Inc.*,
   676 F.2d 1291 (9th Cir. 1982) ......................................................... 14

*U.S. Healthcare v. Healthsource*,
   986 F.2d 589 (1st Cir. 1993).............................................................. 15

*United National Maintenance, Inc. v. San Diego Convention Center, Inc.*,
   766 F.3d 1002 (9th Cir. 2014) ................................................ 21, 22, 23

*United States v. Dentsply Int'l*,
   399 F.3d 181 (3d Cir. 2005) ......................................................*passim*

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966)............................................................................ 12

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ............................................................ 15

*United States v. Syufy Enters.*,
   903 F.2d 659 (9th Cir.1990) .............................................................. 12

*Valley Liquors Inc. v. Renfield Imps.*,
   822 F.2d 656 (7th Cir. 1987) .............................................................. 7

*Vargas v. MCS Servs., Inc.*,
   No. SACV080238DOC(MLG), 2008 WL 11339983 (C.D. Cal. Apr. 30, 2008) 23

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ...................................................... 13, 18

**Statutes**

California's Unfair Competition Law §17200 ............................... 1, 23, 24

Sherman Act ......................................................................................*passim*


**Other Authorities**

Rule 12(b)(6) ................................................................................ 1, 2, 4, 24

PLAINTIFF FASHIONPASS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT
RENT THE RUNWAY, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED
COMPLAINT FOR FAILURE TO STATE A CLAIM

# I.   **INTRODUCTION**

Defendant Rent the Runway ("RTR")'s Motion to Dismiss Plaintiff FashionPass, Inc.'s, ("FashionPass") First Amended Complaint ("FAC") should be summarily denied.  The FAC plausibly alleges textbook predatory and exclusionary conduct by RTR which, if proven, violates Section 2 of the Sherman Act and California's Unfair Competition Law ("UCL") and constitutes tortious interference with contract and economic relationships.

RTR's Motion to Dismiss ("Motion") largely ignores the well-pleaded allegations in the FAC and presents a set of alternative facts that it asks the Court to resolve in its favor.  RTR's moving brief (a) misleadingly cherry-picks allegations in the FAC which it then mischaracterizes to fit its legal arguments, (b) unjustifiably attacks FashionPass for amending the Complaint to augment its antitrust claims to focus on RTR's unilateral conduct,[1] and (c) impermissibly invokes matters outside the FAC (which actually contradict the well-pleaded allegations of the FAC that must be accepted as true for Rule 12 purposes), in effect, to urge the Court to grant summary judgment at this pleading stage.[2]  RTR's overreaching to invoke evidence far outside the four corners of the FAC in order to mount this challenge speaks volumes about the

---

[1] RTR's insinuation that FashionPass has acted improperly or "flip-flopped" by amending its Complaint to allege monopolization is both wrong and unavailing.  For example, RTR asserts that "[t]he Rules do not countenance FashionPass's attempt to abandon its admission."  ECF Dkt. No. 53 at 19-20.  As explained herein, FashionPass has not done that, but even if it had, RTR is off base.  Under Ninth Circuit law, "the fact that an amended complaint . . . contains an allegation that is apparently contrary to an earlier iteration of the same pleading" does not render the later pleading a "sham," as RTR suggests. *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 858 (9th Cir. 2007).  There "is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations.  Unless there is a showing that the party acted in bad faith." *Id.*

[2] As for RTR's effort in this Motion, the Rule 26 report, the legal press, and in numerous pieces of correspondence to counsel to detract from the merits of the case by disparaging FashionPass's choice of counsel and implying unethical conduct by Sidley Austin, that is entirely irrelevant to the Court's determination of this Motion and false in any event.  If RTR had believed in good faith that Sidley had a conflict of interest, RTR would have filed a motion to disqualify.  It did not do so and that ends any appropriate discussion of the subject.

1

1    sufficiency of FashionPass's allegations.

2    ## II.    FACTUAL ALLEGATIONS

3        **The bottom line is this:**  as the FTC clearly alleges, RTR's intentional

4    misuse of its dominant market share in the domestic fashion rental market to coerce

5    designer fashion brands into a web of exclusive deals, with no legitimate business

6    justification, and with the obvious effect of reduced designer output and higher

7    fashion subscription pricing, violates Section 2 of the Sherman Act.  No amount of

8    twisting and mischaracterizing this basic allegation (or disparagement of

9    FashionPass's lawyers) can change that this is what the FAC alleges.  These

10   plausible allegations must be accepted as true for Rule 12 purposes, and RTR's

11   Motion must be denied.

12       RTR internally referred to its intentional scheme to foreclose competition as

13   the "big initiative" for 2019 to secure "rental exclusivity" from designer fashion

14   brands.  FAC ¶¶ 11-12.  RTR's terms and conditions for purchase from the coerced

15   brands were modified to include a so-called "right of first opportunity" ("ROFO")

16   concept, but RTR explained to the brands in emails, phone calls, and in-person

17   meetings exactly what "rental exclusivity" meant: the brands either agree to sell to

18   RTR and no other rental company, or RTR would reduce or eliminate its anticipated

19   orders from that brand going forward.  *Id*. ¶¶ 11, 26.  Brands did not withstand this

20   coercion and stopped selling to RTR's competitors.

21       This threat was irresistible because RTR wields monopoly power by virtue of

22   its incumbent financial position and massive customer base. *Id*. ¶¶ 3-4.  Put simply,

23   RTR buys so much fashion product to showcase and rent to its 11 million customers

24   that the fashion brands it targeted for rental exclusivity could not refuse RTR's new

25   exclusionary terms.  *Id*. ¶ 8.  In fact, RTR is the single dominant player in the

26   United States fashion rental industry, with a recent valuation of $1 billion, and

27   annual revenues over $100 million.  *Id*. ¶ 3.  Controlling at least 50-90% of the

28

2

PLAINTIFF FASHIONPASS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT
RENT THE RUNWAY, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED
COMPLAINT FOR FAILURE TO STATE A CLAIM

fashion rental market, RTR dwarfs all of its competitors to the extent that no other rental company has greater than 5-10% market share by any measure.  *Id*.  ¶¶ 5, 36.

Prior to revelations of RTR's rental exclusivity scheme, the fashion rental market was expanding with the burgeoning success of vibrant new entrants, including Plaintiff FashionPass, that filled perceived gaps in the rental market dominated by RTR—namely, access to unique brands and styles at a lower price point.  *Id*.  ¶ 14.  Market observers estimated that global online fashion rental revenues will reach $2 billion by 2023 (*Id*.  ¶ 8)—in the absence of anticompetitive conduct by a monopolist.

Faced with increasing competition from new entrants in a growing industry, RTR did not look for legitimate ways to maintain its market position.  *Id*.  ¶¶ 15, 42.  Instead, it sought to cement it and foreclose competition with a campaign of dirty tricks and anticompetitive conduct.  *Id*.  ¶¶ 11, 15, 41-42.  Drawing in large part on RTR's own communications (a fraction of which were produced in the limited discovery ordered by this Court), the FAC details the facts surrounding RTR's scheme, conceived and executed by RTR's senior management.  The FAC identifies 22 different designer brands by name with which FashionPass and other competitors had economic relationships that were coerced into "rental exclusivity" with RTR; there are likely many more, but RTR has not provided the comprehensive list of coerced brands.  *Id*. ¶¶ 11, 21, 44.  The exclusive arrangements are not limited in time – the brands targeted by RTR are locked to them and foreclosed to others indefinitely, or at least at the whim of RTR.  *Id*.  ¶ 26.

Under the conditions of this market, in which the most significant barrier to entry and expansion is having purchase relationships with unique brands (*Id*.  ¶¶ 54-58), RTR's web of coerced exclusive arrangements is paradigmatic predatory conduct actionable under Section 2 for the following reasons: (1) RTR dominates the market, (2) RTR already has a monopoly share of the market, (3) RTR's scheme

3

1  harms competition by reducing output and choices to consumers, raising rental

2  subscription pricing, and elevating entry barriers because coveted brands are

3  artificially unavailable for competitors, and (4) there is no legitimate business

4  justification for RTR's conduct.  *Id*.  ¶¶ 10-11.  The only plausible explanation for

5  RTR's scheme was its wrongful intent to crush its competition.  This is precisely

6  that type of harm to competition that courts throughout the country have recognized

7  in Section 2 cases.

8      RTR's Motion is a stew of alternative facts, inadmissible assertions,

9  attenuated inferences, and inapposite legal theories.  It should be denied so that

10 FashionPass and the Court can discover and then litigate the full extent of RTR's

11 predatory scheme to harm competition.

## III.  LEGAL STANDARD

13     For a Rule 12(b)(6) motion, this Court is required to accept as true all

14 well-pleaded, factual allegations of the complaint and to draw all reasonable

15 inferences in favor of the plaintiff.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009).

16 As this Court previously recognized, a court "may generally consider only

17 allegations contained in the pleadings, exhibits attached to the complaint, and

18 matters properly subject to judicial notice." *Swartz v. KPMG LLP,* 476 F.3d 756,

19 763 (9th Cir. 2007); *see also Marder v. Lopez,* 450 F.3d 445, 448 (9th Cir. 2006).

20 Materials outside of the four corners of a complaint should not be considered on a

21 Rule 12(b)(6) motion unless and until a district court converts the motion into one

22 for summary judgment after proper notice.  *Hamilton Materials Inc. v. Dow Chem.*

23 *Corp*., 494 F.3d 1203, 1207 (9th Cir. 2007).

24     Finally, the key elements of the claims put at issue in RTR's motion are not

25 appropriately decided at the pleading stage, including market power and substantial

26 foreclosure.  *See, Authenticom, Inc. v. CDK Global, LLC* (*In re Dealer Mgmt. Sys.*

27

28

*Antitrust Litig*.), 313 F. Supp. 3d 931, 958 (N.D. Ill 2018); and *Newcal Indus., Inc. v Ikon Office Solution,* 513 F.3d 1038, 1045 (9th. Cir 2008).

## IV.   ARGUMENT

### A.   FashionPass Sufficiently Alleges Actual and Attempted Monopolization

FashionPass sufficiently alleges actual monopolization and attempted monopolization.  First, FashionPass alleges actual monopolization, the two elements of which are "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 595-96 n.19 (1985).  Second, FashionPass alleges attempted monopolization, the three elements of which are "(1) a specific intent to monopolize the relevant market; (2) predatory or anticompetitive acts in furtherance of the intent; and (3) a dangerous probability of success." *M & M Medical Supplies & Service, Inc. v. Pleasant Valley Hospital, Inc.,* 981 F.2d 160, 166 (4th Cir.1992).

### 1.   RTR Possesses Monopoly Power in the Relevant Market

To demonstrate market power circumstantially, a plaintiff must: "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Retrophin, Inc. v. Questcor Pharm., Inc*., 41 F. Supp. 3d 906, 916 (C.D. Cal. 2014).

### a.   FashionPass Sufficiently Defines the Relevant Market

The FAC defines the relevant market in this case as "the market for fashion rentals in which both RTR and FashionPass participate and compete.  Participants in this market purchase clothing from fashion brands and then allow customers to rent that clothing for special events, work, and casual wear[;] the customers return the

PLAINTIFF FASHIONPASS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT
RENT THE RUNWAY, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED
COMPLAINT FOR FAILURE TO STATE A CLAIM

items to the fashion rental company, which professionally cleans the items and makes them available for others to rent." *See* FAC ¶ 34.  In its Motion, RTR concedes that it "introduced the idea of fashion rental to the marketplace, [and] is now well-known in the industry." ECF Dkt. No. 53 at 5.  It also concedes that FashionPass also offers fashion for rent and appeals to a similar (though purportedly narrower) customer base as RTR.  *Id*. at 6.  As further evidence that RTR acknowledges the relevant market, RTR introduces its own improper allegations regarding other competitors in the fashion rental market.  *Id*. at 19.

In a previous ruling, the Court accepted FashionPass's market definition for purposes of this pleading stage.  ECF Dkt. No. 27 at 5.  ("The Court would not, however, find that Plaintiff has failed to 'plausibly define the relevant market as alleged by Defendant in the MTD. . . . At this stage of the proceedings . . . [a]ll Plaintiff must allege to state a valid claim is that a relevant market exists and that defendant has market power in said area.").  Thus, RTR's renewed argument that FashionPass's market definition is "implausibly narrow" and "'unsustainable on its face'" fails again.  ECF Dkt. No. 53 at 18.  In any event, as the Court noted previously, whether an antitrust plaintiff has properly defined the relevant market is almost always a question of fact for a jury.  *See Newcal Indus., Inc. v Ikon Office Solution,* 513 F.3d 1038, 1045 (9th. Cir 2008); *see also Dean Foods Co. v. Food Lion, LLC*, 135 S. Ct. 676 (2014) (market definition "is better left for a jury to decide").  "There is no requirement that these elements of the antitrust claim be pled with specificity."  *Newcal Indus., Inc.*, 513 F.3d at 1045.

### b.  FashionPass Adequately Shows that RTR Owns a D.ominant Share of the Market

The FAC alleges that RTR owns a monopolist's share of the fashion rental market—likely close to 90%.  FAC ¶¶ 5, 36.  RTR's leadership touts the company's dominance, claiming that it has 11 million customers, signs 100 new designer

6

1   brands every six months, and aims to achieve a $100 billion valuation.  *Id*.  ¶¶ 3, 6.

2   In light of these well-pleaded allegations, RTR's claim that the FAC shows RTR

3   owns no more than a 5% market share is not credible.[3]  ECF Dkt. No. 53  at 19, 21.

4   In addition, RTR argues for an incorrectly high market share requirement at the

5   pleading stage by cherry-picking inapposite cases where 50-90% market share was

6   not alleged at all or not supported by sufficient facts. This is not one of those cases.

7       Here, FashionPass alleges, based upon publicly-available information, that

8   "RTR presently controls at least 50% of the domestic rental market," though "the

9   percentage is likely closer to 80% or 90%", "with no other single competitor

10   achieving anything more than a 5-10% share as measured by subscribers or

11   revenues."  FAC ¶¶ 5, 36.  RTR acknowledges FashionPass's allegations, yet

12   contends that "FashionPass does not allege sufficient facts to make it plausible that

13   RTR holds a dominant market share."  ECF Dkt. No. 53 at 18-19.  RTR is wrong.

14       In fact, FashionPass's allegations of market share are more than sufficient.

15   *See, e.g.*, *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 925 (9th Cir.

16   1980) (Ninth Circuit reversed a ruling that an allegation of market share of 65% was

17   an insufficient pleading of market power); *Valley Liquors Inc. v. Renfield Imps.*, 822

18   F.2d 656, 667 (7th Cir. 1987) (absent "special market conditions or other

19   compelling evidence of market power, the lowest possible market share legally

20   sufficient to sustain a finding of monopolization is between 17% and 25%");

21   *Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984) ("[A]

22   party may have monopoly power in a particular market, even though its market

23   share is less than 50%.");  *Broadway Delivery Corp. v. UPS*, 651 F.2d 122, 130 (2d

---

[3] This calculation by RTR, which is the best example of RTR misconstruing the
allegations of the Complaint, appears to divide a reported "global" fashion rental
market trend toward $2 billion in 5 years—in the absence of recently-revealed
anticompetitive conduct by the dominant firm, RTR—by the current estimate of
RTR's revenue.  To be clear, RTR's contention that it has at most a 5% market
share is contradicted by the well-pleaded allegations in the FAC that RTR likely
owns 90% of the fashion rental market or is dangerously likely to achieve that share
with its scheme.

7

1  Cir. 1981) (finding jury instruction precluding finding of monopoly power with

2  market share less than 50 percent erroneous); *In re Payment Card Interchange Fee*

3  *& Merch. Disc. Antitrust Litig*., 562 F. Supp. 2d 392, 401 (E.D.N.Y. 2008) (denying

4  motion to dismiss despite defendant's alleged 30 percent market share, stating

5  "[j]ust as a defendant's large market share, without more, cannot support a finding

6  of monopoly power, a low market share by itself cannot necessarily defeat such a

7  finding" in light of other allegations of monopoly power).

8      Indeed, market share is not the only indirect factor considered in determining

9  whether monopoly power exists.  Other factors, as evidenced by RTR's conduct

10  described in the FAC, are also highly relevant.  *See e.g.*, *Hunt-Wesson Foods, Inc.*

11  627 F.2d at925 ("[M]arket share is just the starting point for

12  assessing market power…."); *United States v. Dentsply Int'l*, 399 F.3d 181, 187 (3d

13  Cir. 2005) ("Other germane factors include the size and strength of competing firms,

14  freedom of entry, pricing trends and practices in the industry, ability of consumers

15  to substitute comparable goods, and consumer demand."); *Allen-Myland, Inc. v.*

16  *IBM*, 33 F.3d 194, 209 (3d Cir. 1994) ("Market share, of course, is only one type of

17  evidence that may prove the defendant has … market power.").

18      RTR, once again, improperly seeks to litigate the ultimate merits of this fact

19  question at the pleading stage, and it improperly refers to facts outside of the

20  pleadings to do so.  ECF Dkt. No. 53 at 19-20.

21          **c.    FashionPass Alleges Significant Barriers to Entry**

22      FashionPass adequately alleges that RTR's coercive scheme to permanently

23  lock up supply of unique designer brands through "rental exclusivity" agreements

24  creates insurmountable barriers to entry for potential new entrants and severely

25  constrains the growth of existing competitors, thereby harming competition.  The

26  Ninth Circuit has cited as cognizable entry barriers the following:  "(1) legal license

27  requirements; (2) control of an essential or superior resource; (3) entrenched buyer

28

8

PLAINTIFF FASHIONPASS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT
RENT THE RUNWAY, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED
COMPLAINT FOR FAILURE TO STATE A CLAIM

preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995).

As detailed in the FAC, the biggest challenge for nascent rental companies is forming (and keeping) economic relationships with unique fashion brands that consumers will pay to rent. FAC ¶¶ 54-59. Sought-after brands look to a rental company's "vendor matrix" (the list of brands that the company works with) to determine if it is willing to associate with the company. *Id*. Aware of this, rental companies leverage their existing relationships with brands in order to sign new brands. *Id*. As such and as alleged, RTR's rental exclusivity scheme forecloses competitors' ability to purchase new inventory from each of the 22-plus brands that RTR has coerced into rental exclusivity. Critically, the scheme creates a *de facto* barrier entry for competitors as new entrants will be denied the ability to establish relationships with brands in the first instance. FAC ¶ 54-59. In other words, RTR has engineered a fatal condition where existing competitors cannot grow and new entrants will be permanently foreclosed from accessing critical suppliers. These barriers, which FashionPass will be able to further explore through discovery, are legally and factually sufficient. *Sidense Corp. v. Kilopass Tech. Inc.*, No. 14-CV-02238-SI, 2015 WL 7759442, at *7 (N.D. Cal. Dec. 2, 2015) (citation and quotation omitted) (Plaintiff sufficiently pled barriers to market entry; "[i]n evaluating entry barriers, we focus on their ability to constrain not 'those already in the market, but...those who would enter but are prevented from doing so"); *see also Jensen Enterprises Inc. v. Oldcastle, Inc.*, No. C 06-00247 SI, 2006 WL 2583681, at *7 (N.D. Cal. Sept. 7, 2006) (holding that Plaintiff's allegation that "there is a significant barrier to entry" is sufficiently pled); *see also Retrophin, Inc* 41 F. Supp. 3d at 917 ("Ultimately, whether there are in fact significant barriers to entry is not an issue appropriately decided on this Motion [to dismiss]").

9

RTR concedes that the FAC alleges that insurmountable barriers to entry exist in the market.(ECF Dkt. No. 53 at 19.  RTR's principal argument is that FashionPass changed its position from the original complaint by describing the entry barriers differently.  *Id*. at 19-20.  This was not, as RTR erroneously argues, an attempt by FashionPass to "abandon its admission."  *Id*.  In its Complaint, FashionPass alleged as follows:

> There are few [not "no" or "low"] barriers to enter the Fashion Rental Business.  Those barriers that exist include (a) fashion and design acumen, and knowledge of the fashion industry; (b) capital sufficient to acquire merchandise and the infrastructure required to stock, display, and ship inventory; and (c) technological sophistication of website design and function.  Importantly, in the absence of the kind of wrongful, anti-competitive conduct [committed by RTR] manufacturers supplying garments at wholesale to retail merchants in the fashion industry do not distinguish between Fashion Rental Companies and traditional retail sellers, and place no restrictions upon purchases by Fashion Rental Companies.  Complaint at 4.

This paragraph  established: (1) barriers to entry in the fashion rental business include knowledge of the fashion industry, plus fashion and design acumen, in addition to capital and a sophisticated web infrastructure; and (2) in the absence of RTR's anticompetitive scheme to lock up inventory for itself alone, it would be no more challenging for rental companies to buy inventory from sought-after designer brands than it is for traditional retailers which do not have exclusivity schemes.  In short, the Complaint alleged that RTR transformed a free and fair market that was open to new rental competitors into a market with insurmountable barriers to entry.

The FAC distills these allegations regarding entry barriers to emphasize the difficulty that new competitors face in establishing relationships with designer brands, which highlights the competitive harm of RTR's scheme.  FAC ¶¶ 54-59.  There is nothing incompatible between these allegations.

10

PLAINTIFF FASHIONPASS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT RENT THE RUNWAY, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

1     Finally, RTR's contention that there could be no significant entry barriers

2  because other companies have entered the rental service is illogical and improper at

3  this stage.  ECF Dkt. No. 53 at 19-20.  Even if the Court were to consider RTR's

4  alternative facts regarding new market entrants (which it should not[4]), RTR

5  nonetheless ignores precedent, including authorities it cites to, which hold the fact

6  that entry has occurred does not necessarily preclude the existence of "significant"

7  entry barriers.  *See e.g.*, *Rebel Oil Co. v* 51 F.3d at 1440 ("The fact that entry has

8  occurred does not necessarily preclude the existence of 'significant' entry

9  barriers."); *Oahu Gas Serv., Inc. v. Pac. Res. Inc.,* 838 F.2d 360, 366-

10  67 (9th Cir.1988) ("A declining market share may reflect an absence of market

11  power, but it does not foreclose a finding of such power." (quotation omitted);

12  *Reazin v. Blue Cross & Blue Shield of Kan., Inc.,* 899 F.2d 951, 971 (10th Cir.1990)

13  (rejecting defendant's argument that presence of multiple competitors demonstrated

14  that entry barriers were insubstantial where "no other entrant remotely approached

15  [defendant's] domination of the market").[5]

16     **2.     RTR Has Acquired, Enhanced, or Maintained its Market Power By**

17  **Exclusionary Conduct**

18

19  [4] There are numerous reasons why an existing rental company might acquire a
20  traditional retail brand, or why a large retail corporation might choose to enter the
   rental market at this time that do not reflect in any way on the barriers to entry
21  alleged in the FAC.  Perhaps advance knowledge of the threat of these growing
   competitors motivated RTR to concoct its rental exclusivity to foreclose key supply
22  in late 2018.  Perhaps these companies launched their business models before
   FashionPass revealed through this lawsuit that RTR had used predatory tactics to
23  lock up many of the most sought-after brands with "rental exclusivity".  Perhaps
   they are optimistic that this Court will enjoin RTR from continuing its
24  anticompetitive scheme and are positioning themselves to compete in a future rental
   market that is free and fair.  In any event, there is no way to evaluate the context and
25  import of these alternative allegations offered by RTR at this pleading stage, when
   the FAC makes no mention of them.  As discussed herein, all of RTR's new
   allegations not contained in the FAC should be stricken.

26  [5] If RTR asserts new, more specific arguments for the first time in its reply, the
27  Court should decline to consider them.  *See Kentwool Co. v. NetSuite Inc.*, No. 14-
   cv-05264-JST, 2015 U.S. Dist. LEXIS 19982, at *13–14 n. 3 (N.D. Cal. Feb. 18,
28  2015).

PLAINTIFF FASHIONPASS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT
RENT THE RUNWAY, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED
COMPLAINT FOR FAILURE TO STATE A CLAIM

RTR's share of the market as alleged is more than adequate to establish a *prima facie* case of market power.  In addition, RTR has held its dominant share for years and has fought aggressively to maintain that imbalance when confronted with competition.  One court has commented that, "[i]n evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share." *United States v. Syufy Enters.,* 903 F.2d 659, 665–66 (9th Cir.1990).

Although not *per se* illegal, exclusive dealing arrangements can be an improper means of maintaining a monopoly. *United States v. Grinnell Corp.,* 384 U.S. 563 (1966).   "Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist. . . . [A] monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior."  *Dentsply Int'l, Inc.*, 399 F.3d at 186–87 (internal quotation and citation omitted).

Here, beginning in the fall of 2018, faced with the prospect of budding competition in the fashion rental market, RTR's upper management concocted and then put pressure on its representatives to implement a scheme that was specifically intended to, and which did in fact, coerce fashion brands to refuse to sell to other fashion rental companies, including FashionPass.  RTR told the brands, in effect, "don't sell to RTR's competitors, or we won't do business with you." FAC ¶ 11. While FashionPass is aware that these anticompetitive terms were forced onto at least twenty-two (22) brands, the full impact of RTR's scheme, including the number of brands impacted, and thus the true extent that competition has been harmed, has been kept secret by RTR.  *Id.*

In *Dentsply Int'l Inc.*,  the court evaluated an alleged exclusive-dealing arrangement in which the defendant utilized policies that discouraged dealers from adding competitors' teeth to their product lines.  399 F.3d 181.  In evaluating

PLAINTIFF FASHIONPASS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT
RENT THE RUNWAY, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED
COMPLAINT FOR FAILURE TO STATE A CLAIM

whether Dentsply had market power, the court emphasized Supreme Court precedent on the need to examine the economic realities as opposed to formalities. *Id.* at 189. "Antitrust policy requires the courts to seek the economic substance of an arrangement, not merely its form." *Id.*

Here, RTR urges the Court to focus on the written terms of its contracts and to ignore the substance of FashionPass's allegations—namely, that while the written contracts are "styled as rights [of RTR] of first opportunity," in reality, the terms are "exclusivity provisions" and "RTR's rights under these terms are not time-limited." FAC ¶ 26. Indeed, "previously secret emails between RTR and the brands' showroom agents or the brands themselves, the true meaning of these restrictive covenants are explained and enforced by 'offline,' verbal communications and threats." *Id.* RTR asks the Court to set aside these allegations and accept as true its own alternative facts that "by the ROFO's *express terms*, accepting brands are merely required to first present the opportunity to purchase goods to RTR on an item-by-item basis. Then, RTR has only a short 14-day window to exercise its purchase option." ECF Dkt. No. 53 at 14 (emphasis in original). RTR's allegations directly contradict the FAC and entirely ignore the substance of RTR's rental exclusivity scheme as alleged. Here, as in *Dentsply*, the Court must "seek the economic substance of an arrangement, not merely its form," which RTR takes great measures to mask.

### i. FashionPass Adequately Alleges Substantial Foreclosure

"The primary antitrust concern with exclusive dealing arrangements is that they may be used by a monopolist to strengthen its position, which may ultimately harm competition." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012); *see also Twin City Sportservice, Inc. v. Charles O Finley & Co., Inc.*, 676

13

PLAINTIFF FASHIONPASS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT
RENT THE RUNWAY, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED
COMPLAINT FOR FAILURE TO STATE A CLAIM

F.2d 1291, 1304 (9th Cir. 1982) (the issue is whether the restraint in question "is one that promotes competition or one that suppresses competition").

The FAC alleges that RTR's "rental exclusivity" scheme substantially forecloses competition through exclusionary means, and further alleges that there are no procompetitive benefits to RTR's conduct. *See, e.g.*, FAC ¶¶ 60-61. RTR does not argue that "rental exclusivity" benefits the competitive market in any way—nor could it, insofar as there is no valid business justification for its conduct, which solely aims to suppress and ultimately eliminate competition. *Id*. ¶ 60. Rather, RTR quibbles that FashionPass's foreclosure showing is "far from substantial" because: (1) RTR's scheme affects, thus far, affects "only" 30% of FashionPass's revenue and 25% of FashionPass's "brand portfolio", (2) fashion brands are still free to sell to "fashion ***retail*** competitors", and (3) FashionPass's website still references 13 of the 22 foreclosed brands as available for rental. ECF Dkt. No. 53 at 14-15. Each of these arguments is specious.

*First*, the question of substantial foreclosure is not appropriately decided at the pleading stage. *See e.g.*, *Authenticom, Inc* 313 F. Supp. 3d at 958 ("The question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage) (internal quotation and citation omitted). However, even assuming that this issue is appropriate to decide now, a revenue loss to FashionPass of 30% and 25% of its brand portfolio to date is more than substantial, particularly where RTR's scheme has only recently begun to affect other rental companies' ability to supply the newest, most sought-after designer brands to its customers. As described in the FAC, the harm to competition will compound once customers realize that they will no longer be able to rent the clothing that they covet from any company other than RTR, and will be forced to switch to RTR's platform. Critically, the statistics alleged in the FAC are based on a preliminary investigation because FashionPass

14

PLAINTIFF FASHIONPASS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT RENT THE RUNWAY, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

does not yet have access to information solely in RTR's possession regarding the number of brands which have been foreclosed to all other rental competitors.  The number is likely much higher than 22, *a fact about which RTR is conspicuously silent in its briefing,* with concomitant economic losses to all rental companies who rely on these unique designer brands to operate.  FAC ¶ 11.  Courts consider "the effects of [the defendant's] conduct in the aggregate, including, as appropriate, cumulative or synergistic effects'" in determining whether the conduct "constitutes an unreasonable restraint on trade," and "[t]here is no hard-and-fast-rule for determining the point at which market foreclosure becomes 'substantial.'"  *Church & Dwight Co. v. Mayer Labs., Inc.,* No. C-10-4429 EMC, 2011 WL 1225912, at *6, *15-16 (N.D. Cal. Apr. 1, 2011); *see also U.S. Healthcare v. Healthsource*, 986 F.2d 589, 587-98 (1st Cir. 1993) ("[Exclusive dealing] can be wrongful in the context of section 2 only where it has or threatens to have a significant exclusionary impact. But a lesser showing of likely effect *might* be required if the actor were a monopolist or one within striking distance."); *3M Co. v. Appleton Papers*, 35 F. Supp. 2d 1138, 1145 (D. Minn. 1999) (rejecting defendant's position that  § 2 exclusive dealing analysis should be "collapsed into the [§ 1] analytical framework" because, among other things, there was no finding of market power in *Tampa Electric*); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) ("[A] monopolist's use of exclusive contracts ... may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation.").

    *Second*, RTR's claim that there can be no foreclosure because "fashion *retail competitors*" have not been foreclosed by RTR's rental exclusivity scheme is a red herring.  ECF Dkt. 53  at 14.  The fashion rental market alleged in the FAC, and previously accepted by the Court for pleading purposes, is a recognized industry that is distinct from traditional retail companies.  They are not "competitors" for

15

1   purposes of pleading an antitrust claim.  *See e.g.*, FAC ¶ 6 (RTR's founder "is

2   quoted as saying that she wants to ruin even [retail] companies that do not compete

3   in the relevant fashion rental market[.]").

4       *Third*, contrary to RTR's assertion, FashionPass never "boast[ed]" in the FAC

5   "that it works with *13* of the 22 brands its alleges are foreclosed from the market."

6   (ECF Dkt. No. 53 at 14).  More importantly, RTR's claim that foreclosure did not

7   occur because FashionPass (and other competitors) still have outdated inventory

8   from the foreclosed brands is not even a good faith argument.  Well-pleaded

9   allegations make clear that "[RTR's scheme has] caused countless fashion brands to

10  accede to undesired rental exclusivity with RTR and to cease doing business with

11  FashionPass and other participants in the fashion rental market."  FAC ¶ 26.

12  "Indeed, to date, the scheme has already deprived FashionPass of access to at least

13  22 brands that RTR targeted, representing about 30% of revenues."  *Id*. ¶ 45.  The

14  crucial point, as the FAC alleges and as RTR well knows, is that RTR's rental

15  exclusivity scheme prevents all competitors, including FashionPass, from

16  purchasing any *new* inventory.  As the FAC alleges, FashionPass's customers have

17  already inquired about the absence of new inventory from targeted brands and the

18  harm will continue to magnify as customers are forced to abandon FashionPass and

19  other smaller competitors to find the clothing they covet from only one source:

20  RTR.  FAC ¶¶ 12, 25.

21      Established law makes clear that the allegations suffice.  In *Dentsply*

22  *International Inc*., for example, the Third Circuit explained that the "test is not total

23  foreclosure, but whether the challenged practices bar a substantial number of rivals

24  or severely restrict the market's ambit."  399 F.3d at 191.[6]  Here, the FAC alleges

---

25  [6] RTR relies on *Rheumatology Diagnostic Lab., Inc. v. Aetna, Inc.,* No. 12-05847,

26  2013 WL 5694452 (N.D. Cal. Oct. 18, 2013) (*Rheumatology II*) and misleadingly

    describes this case as finding that "plaintiffs failed to allege substantial foreclosure

27  of competition, just harm to competitors"; and "finding that foreclosure level of less

    than 30% insufficient in § 2 exclusive dealing case."  ECF Dkt. 53 at 14-16.  This

28  summary is inaccurate.  In reality, the court found that plaintiffs failed to allege any

PLAINTIFF FASHIONPASS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT
RENT THE RUNWAY, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED
COMPLAINT FOR FAILURE TO STATE A CLAIM

substantial foreclosure, not just based on the number of rental exclusivity arrangements that RTR has, but also based upon RTR's predatory conduct of "wield[ing] its market power to serially target FashionPass's—and, on information and belief, other competitors'—*most valued* brands." FAC ¶ 24-27 (emphasis in original). The anticompetitive effects of permanently locking up unique, sought-after fashion brands that are critical to FashionPass's and other rental companies' brand identity, goodwill, and revenue cannot be easily reduced to a number at this stage. Indeed, there may be many more brands that RTR has coerced into rental exclusivity arrangements, and RTR will likely wield its market power to enter into many more rental exclusivity arrangements. FAC ¶ 21. Therefore, here, as in *Dentsply*, the analysis does not simply turn on the number of exclusive arrangements that RTR has entered into, or even the threshold percentage of foreclosure, but rather "whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."

### 3.    FashionPass Clearly Pleads Harm to Competition

To determine whether RTR's agreements unreasonably restrain trade in violation of the Sherman Act, FashionPass must plead that it was harmed by RTR's anti-competitive scheme, and that the rental exclusivity initiative "actually injures competition." *Brantley v. NBC Universal Inc.*, 675 F.3d 1192, 1196-97 (9th Cir. 2012). To meet the element of injury to competition, a plaintiff need only "sketch the outline of the injury to competition" with allegations of supporting facts

facts about share of the five product and geographic markets alleged in the operative complaint. Moreover, plaintiffs did not allege any facts about how Quest's actions restricted competition—no context other than that Quest continued to grow by acquisitions. However, the court found, plaintiff's claims were not based on anticompetitive acquisitions. Here, FashionPass has alleged a single market for domestic fashion rentals through extensive well-pleaded allegations about how RTR uses its monopoly power as the largest buyer and largest "selling" platform in the fashion rental industry to coerce suppliers into doing business only with it. Moreover, the FAC alleges that competition is foreclosed where unique and sought-after brands are locked up by RTR, and that RTR's scheme will continue to exacerbate this problem for existing companies attempting to expand and new entrants.

17

sufficient to state a claim that is "plausible on its face." *Id.* at 1198.  "Vertical agreements that foreclose competitors from entering or competing in a market can injure competition by reducing the competitive threat those competitors would pose." *Id.*  In analyzing harm to competition, courts have provided the following description:

> [S]uppose an established manufacturer has long held a dominant position but is starting to lose market share to an aggressive young rival.  A set of strategically planned exclusive-dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its product, or rely at least temporarily on inferior or more expensive outlets.  Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth.  *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 832 (11th Cir. 2015) (internal citation and quotation omitted).

The scenario outlined by the 11th Circuit in *McWane* is on all fours with the facts here.  The governing precedent speaks not of "clear evidence" or definitive proof of anticompetitive harm, but of "probable effect."  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961) (instructing courts to weigh the "*probable effect* of the [exclusive dealing] contract on the relevant area of effective competition" (emphasis added);  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 268 (3d Cir. 2012) ("Under the rule of reason, an exclusive dealing arrangement will be unlawful only if its 'probable effect' is to substantially lessen competition in the relevant market." (citation and quotation omitted); *see also McWane, Inc.*, 783 F.3d at 836.[7]

---

[7] RTR's reliance on *Maximum Availability Ltd., v. Vision Sols., Inc.*, No. 10-1488, 2010 WL11508470 (C.D. Cal. Dec. 16, 2010) misses the mark because unlike the allegations in *Maximum Availability Ltd.*, here, RTR concedes in its MTD that the FAC alleges harm to competition.  (ECF Dkt. 53 at 12.)  Numerous well-pleaded allegations refer to harm to competitors other than FashionPass, and to competition as a whole. Similarly, Plaintiffs' reliance *on Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988 (N.D. Cal. 2015), is also inapposite.  In that Sherman Act Section I case alleging conspiracy and boycott, the court found that in a case alleging boycotts, plaintiff needed to allege more than "substantial influence" over the market but plaintiff failed to do so.  The court further found that plaintiff's allegations of injury to competition in the market as a whole were conclusory because "Plaintiffs simply recite the legal conclusion that competition has been

18

The allegations in the FAC clearly meet this standard.  Yet, recycling the arguments from its prior motion to dismiss the original complaint, RTR loudly insists that "FashionPass continues to focus on harm to itself rather than" defining adverse effects of RTR's scheme on the market.  ECF Dkt. 53 at 10.  This is an overt attempt to ignore the actual language of the FAC.  RTR wrongly concludes that the sum total of the FAC's allegations can be reduced to one minor issue: "At most, FashionPass alleges that certain brands are selling more through RTR than itself."  *Id*. at 12.  RTR fails to provide a citation for this purported allegation because it is not found in the FAC.  Continuing to ignore the actual content of FashionPass's allegations, RTR goes on to assert that the FAC contains no allegation that the foreclosed brands "do not and cannot continue to sell some items or all items to FashionPass or any *other fashion rental companies*."  *Id*. at 12-13.

In fact, that precise allegation is at the heart of this lawsuit, and is reiterated numerous times in the FAC:

> "[B]eginning in the fall of 2018, and extending through the present day, faced with the prospect of budding competition in the fashion rental market, RTR rolled out a big new initiative (RTR's language) that was specifically intended to, and which did in fact, coerce fashion brands to refuse to sell to other fashion rental companies, including FashionPass.  This anticompetitive plan was implemented at the direction of RTR senior management who pressured RTR sales representatives to impose exclusive arrangements on fashion brands.  RTR told the brands, in effect, "don't sell to RTR's competitors, or we won't do business with you."  These exclusive deals had no legitimate business justification.  They were only intended to cripple competition and have done so.  FAC ¶ 11.

*See also*, *e.g.*, FAC ¶ 3, 6-7, 12, 20-22.

The FAC further details how the fashion rental market has been and will increasingly be harmed by RTR's scheme: (i) "rental exclusivity" severely and

harmed without sufficient factual support." The case is inapposite here insofar as, in support of its Section 2 claims, FashionPass has alleged market power and harm to competition with specific factual support.

19

artificially limits fashion brands' access to competitive online rental platforms and their unique customers; (ii) it reduces brands' output—*i.e.*, their ability to sell a larger variety and volume of merchandise to the rental market—because designer brands are restricted to those items that RTR elects to buy and showcase to its customers; (iii) it forces consumers who seek to rent unique brands that have been locked up by RTR away from RTR's competitors onto RTR's platform; (iv) actual and potential competitors of RTR are foreclosed from offering the range of unique fashion brands that their consumers have come to expect and covet; and (v) left with fewer companies from which to rent the unique brands they covet, consumers have been forced to pay, and will in the future pay, anticompetitive prices.  FAC ¶ 12. This is textbook competitive harm.

Finally, having established that RTR's conduct harmed competition, the burden shifts to the defendant to offer procompetitive justifications for its conduct.  *McWane, Inc.*, 783 F.3d at 840–41.  RTR offers none, because there are none.  FAC ¶ 60, 61.  As such, FashionPass has adequately alleged harm to competition—including to itself, to be sure, but also to competition in the relevant market.

## B.   FashionPass Adequately Alleges its Tortious Interference Claims

FashionPass has alleged independently wrongful conduct that has disrupted its existing and prospective relationships with at least 22 fashion brands, though there are likely many more.  These allegations are sufficient to survive a motion to dismiss.

To state a claim for intentional interference with contractual relations, Plaintiff must allege: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *United National*

*Maintenance, Inc. v. San Diego Convention Center, Inc.,* 766 F.3d 1002, 1006 (9th Cir. 2014) (*quoting Pacific Gas &Elec. Co. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1126 (1990)).

The same set of facts alleged in the FAC supports each of these tort claims. Namely, RTR launched a targeted scheme in 2018 to choke off fashion inventory from its competitors, taking specific aim at FashionPass. One of its first steps was to surreptitiously install a "mole" within FashionPass's customer base to identify the clothing brands that were most sought-after among FashionPass customers. FAC ¶ 17-18. Next, under pressure from RTR senior management, RTR approached the brands it had targeted and demanded information about (i) whether they sold to FashionPass and other rental companies, (ii) which styles and how much volume its competitors had purchased, (iii) which brands, styles and how much volume RTR's competitors were interested in purchasing for upcoming seasons, and (iv) specifically demanded to see (and received) confidential existing purchase orders from FashionPass. *Id.* at ¶ 19. RTR then coerced at least 22 such brands into "rental exclusivity" with RTR to permanently deprive FashionPass of access to many of its most valuable brands, which its customers had relied on in initially or continuing to subscribe to FashionPass's rental service. *Id.* ¶¶ 21-22. RTR also coerced certain brands to cancel existing contracts with FashionPass, as part of its "rental exclusivity" initiative. *Id.* ¶ 24. RTR launched this "big initiative" to harm FashionPass and squeeze it out of the market, which harms competition and allows RTR to maintain its monopoly power, and specifically harms FashionPass in its business and property, causing severe monetary damage. *Id.* ¶¶ 22-23. Because RTR's conduct was only achievable as a result of exclusive arrangements that substantially foreclosed and harmed competition and allowed RTR to maintain its monopoly in the relevant market, RTR's interference with FashionPass's contracts was enabled through its unlawful conduct. *Id.* ¶ 25.

21

### 1.    FashionPass Plausibly Pleads that RTR Knew of Specific Contracts Between FashionPass and the Purchase Order Manufacturers and that RTR Intentionally Disrupted FashionPass's Business Relationships.

Among other things, RTR has abused its market power to extract agreements from fashion brands not to sell to FashionPass and other fashion rental companies. RTR claims that these agreements cannot be actionable because "*facially* the ROFO terms preclude any demonstration of intent to interfere."  ECF Dkt. 53 at 24.  RTR's word choice "facially" should come as no surprise because it implicitly acknowledges the undeniable allegation in the FAC that "[c]onscious of its wrongful intentions, RTR acted surreptitiously to disguise the true terms of its anticompetitive arrangements with fashion brands."  FAC ¶ 26.  As the FAC asserts—and as RTR curiously completely ignores, "the true meaning of these restrictive covenants are explained and enforced by 'offline' verbal communications and threats," which have "caused countless fashion brands to accede to undesired rental exclusivity with RTR and to cease doing business with FashionPass and other participants in the fashion rental market." *Id*.

The only two factors that RTR appears to even address is: (1) RTR's knowledge of the relationship;  and (2) RTR's intentional actions designed to disrupt the relationship.  The FAC sufficiently addresses both of these factors.

*First*, RTR concedes that the FAC alleges that "RTR knew that FashionPass had existing purchase contracts with those brands" that it entered into exclusive arrangements with, and that "RTR embarked on a 'scheme' of soliciting FashionPass-related information from brands."  ECF Dkt. 53 at 25.  RTR further asserts, with no legal or factual support, that RTR was entitled to receive the information that it contracted for from these brands.  In light of the well-pleaded allegations that RTR sought and received detailed information regarding FashionPass's purchase orders, RTR is simply mistaken in its assertion that

PLAINTIFF FASHIONPASS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT RENT THE RUNWAY, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

1   FashionPass "still fail[s] to 'allege facts showing RTR's knowledge of the contracts

2   at issue.'" *Id*.

3       *Second*, FashionPass alleges that the conduct described in its amended

4   complaint was intended to, and has in fact, disrupted its relationships with its

5   suppliers. FAC ¶¶ 43-44, 50-51, 64-67.  The FAC describes at least five contracts

6   that RTR intentionally interfered based on RTR's knowledge of each of these

7   contractual arrangements between FashionPass and the respective brands (FAC ¶

8   64-65); that RTR deliberately intended to cause the respective brands to breach their

9   contracts with FashionPass because RTR insisted that each of the brands refuse to

10  sell merchandise to FashionPass (*Id*. ¶ 66); that RTR threatened to purchase

11  merchandise from those manufacturers or to substantially reduce either the volume

12  or price terms unless the manufacturers granted an exclusive right to sell to RTR

13  (*Id*. ¶ 43); and that RTR communicated its threats to numerous of its existing and

14  new potential brands—sometimes directly and sometimes to the brands' sales

15  representatives at various showrooms (*Id*.  ¶ 44).  These allegations are more than

16  adequate.  *See e.g., Luxpro Corp. v. Apple Inc.*, No. C 10–03058 JSW, 2011 WL

17  1086027, at *15 (N.D. Cal. Mar. 24, 2011) (denying motion to dismiss claim of

18  tortious interference based on Apple's threats to stop doing business with Luxpro's

19  retailers, distributors and suppliers if they continued to do business with Luxpro);

20  *see also Vargas v. MCS Servs., Inc.*, No. SACV080238DOC(MLG), 2008 WL

21  11339983, at *2 (C.D. Cal. Apr. 30, 2008); *Kische USA, LLC v. Simsek*, No. C16-

22  0168JLR, 2016 WL 6273261, at *8 (W.D. Wash. June 29, 2016).

23  **C.   FashionPass Adequately Allege Statutory Unfair Competition in Violation**

24  **of California's UCL (California Business Professional Code §17200**

25      When conduct threatens the incipient violation of antitrust law because its

26  effects significantly threatens or harms competition, a direct competitor may sue

27  under California's UCL.  *Cel-Tech Communications, Inc. v. Los Angeles Cellular*

28

23

PLAINTIFF FASHIONPASS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT
RENT THE RUNWAY, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED
COMPLAINT FOR FAILURE TO STATE A CLAIM

*Telephone Co*., 20 Cal. 4th 163 (1999).  Based on all the foregoing, FashionPass has adequately alleged a violation of Section 17200.

**D.     Defendant RTR's Improperly Attached Exhibits Should be Stricken**

"A district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion."  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (internal citation and quotation omitted).  RTR seeks to have the Court pour through Internet websites—not only of the parties' respective websites, but the websites for *third* parties not involved in this matter—for reasons that RTR fails to articulate.  However, the websites that RTR submits were not attached to the FAC, they are not referenced anywhere in either iteration of FashionPass' complaint, and they certainly do not form the basis of the FAC.[8]  According to the very authority cited by RTR, such an exercise by the Court would be appropriate *only if* plaintiff's claim "necessarily relies" upon the evidence advanced, it is referred to in the pleading, and "the document is central to the plaintiff's claim."  *Marder*, 450 F.3d 445, at 448; *see also Hawthorne v. Umpqua Bank*, No. 11-cv-06700-JST, 2013 WL 5781608, at *4 (N.D. Cal. Oct. 25, 2013).

## V.   CONCLUSION

For the foregoing reasons, RTR's motion should be denied in its entirety.


Date:  September 16, 2019                SIDLEY AUSTIN LLP


By:   /s/ Chad S. Hummel
                Chad S. Hummel

*Attorneys for Plaintiff*
*FashionPass, Inc.*

---

[8] The FAC provides a single reference only to RTR's website strictly for background information.

24